Merrimack
No. 2010-516

STATE OF NEW HAMPSHIRE

v.

NORTH OF THE BORDER TOBACCO, LLC d/b/a TOBACCO HAVEN & a.

Argued: April 13, 2011
Opinion Issued: June 30, 2011

*Michael A. Delaney*, attorney general (*David A. Rienzo*, assistant attorney general, on the brief and orally), for the State.

*Getman, Schulthess & Steere, P.A.*, of Bedford (*Andrew R. Schulman* and *Clara E. Lyons* on the brief), and *Jeffrey A. Burd*, of Cincinnati, Ohio, on the brief and orally, for the respondents.

LYNN, J. The respondents, North of the Border Tobacco, LLC d/b/a Tobacco Haven (Tobacco Haven) and Roll Your Own, LLC (RYO), appeal decisions of the Superior Court (*Smukler*, J.) that enjoined them from allowing customers to use on-site cigarette-making machines[1] to make rolled cigarettes with loose tobacco unless they make the required escrow payments under RSA chapter 541-C (2007). We affirm in part, vacate in part, and remand.

### I

By way of background, in 1998 forty-six states, including New Hampshire, and other United States territories (settling states) entered into a Master Settlement Agreement (MSA) with leading United States tobacco product manufacturers to resolve litigation brought by the settling states over public health costs associated with smoking. *See generally State v. Philip Morris USA*, 155 N.H. 598, 600 (2007) (reciting general factual background). Under the MSA, the settling states agreed to dismiss their lawsuits and to release certain past and future claims against the settling manufacturers in exchange for annual payments by the settling manufacturers, as well as several other concessions, including marketing and advertising restrictions. These annual, nationwide payments are placed into an escrow account, are partly based on relative market share, and are intended to help the settling states "achieve significant funding for the advancement of public health" and "the implementation of important tobacco-related public health measures." *Id.* (quotations omitted). The funds are subsequently allocated among the settling states according to a formula set forth in the MSA.

The drafters of the MSA acknowledged that the marketing restrictions and payment obligations could put the settling manufacturers at a competitive disadvantage relative to tobacco manufacturers who have not joined the MSA (non-participating manufacturers or NPMs) and potentially cause them to lose market share to the NPMs. Thus, the MSA provides for an NPM adjustment, which attempts to level the marketplace

---

[1] The trial court and the parties used various terminology when referencing the machines at issue. For ease, we use the term "cigarette-making machines." Notably, the mechanics of the machines are not disputed; loose tobacco and cigarette tubes are placed into the machine, and the machine converts these materials into rolled cigarettes.

by reducing the annual payment obligations of the settling manufacturers if it is proven that they collectively lost market share to the NPMs; this adjustment requires consideration of several factors set forth under the MSA. Nevertheless, a settling state's allocated payment is not subject to the NPM adjustment if it enacts and enforces legislation, known as a Qualifying Statute under the MSA, requiring NPMs to make annual deposits into an escrow fund to cover public health costs related to smoking. NPMs' escrow payments are based on market share.

In 1999, the legislature enacted a Qualifying Statute, see RSA chapter 541-C (NPM Act). Under the NPM Act, a tobacco product manufacturer selling cigarettes to consumers within the state has two choices; it can ·

(a) Become a participating manufacturer (as that term is defined in subsection II(jj) of the [MSA]) and generally perform its financial obligations under the [MSA]; or

(b) Place into a qualified escrow fund by April 15 of the year following the year in question [certain prescribed amounts based on units sold] (as such amounts are adjusted for inflation).

RSA 541-C:3, I. The escrow fund is aimed at ensuring that the State will have an eventual source of recovery from an NPM should the entity be judgment-proof at the time it may be proven liable for damages for smoking-related health care costs. See RSA 541-C:1, VI. If no such liability is imposed, an entity's escrow funds, with interest, are to be returned to it after twenty-five years. See RSA 541-C:3, II(c). In 2003, the legislature enacted complementary legislation to fortify the enforcement of the NPM Act. RSA chapter 541-D (2007) requires NPMs who sell cigarettes in New Hampshire to annually certify to the attorney general that they are in compliance with RSA chapter 541-C, and to provide a list of all cigarette brand families sold. RSA 541-D:3. The attorney general maintains a state directory of entities which are in compliance, RSA 541-D:3, II, and no entity may sell, offer or possess for sale cigarettes of a brand family not listed in the state directory, RSA 541-D:3, III.

## II

Respondent Tobacco Haven owns a tobacco shop in Brookline that sells a variety of tobacco products, including loose tobacco and certain cigarette-making machines for home use. At some point, it purchased and installed two cigarette-making machines for on-site consumer use, for a rental fee, in conjunction with loose tobacco and cigarette tubes purchased at the store. The machines can inject 200 tubes with tobacco in approximately ten minutes. It is undisputed that the loose tobacco used in conjunction with the

machines was labeled by the supplier as "pipe tobacco," and that Tobacco Haven identified such tobacco as "pipe tobacco" to its customers who used the machines. In August 2009, the State filed a petition for declaratory judgment and preliminary and permanent injunction against Tobacco Haven, requesting the trial court to: (1) declare that Tobacco Haven is a manufacturer of tobacco products pursuant to RSA chapters 541-C and 541-D; (2) issue a temporary injunction "halting the sale of cigarettes made using [Tobacco Haven's] cigarette-making machines"; and (3) enter a permanent injunction "banning the sale of cigarettes made through [Tobacco Haven's] manufacturing process unless and until [it] is in compliance with RSA 541-C and RSA 541-D."

In its answer, Tobacco Haven denied that it was a tobacco product manufacturer under the NPM Act, and subsequently moved to dismiss the petition for failure to state a claim upon which relief can be granted. It also filed an objection to the State's petition for preliminary injunction. According to Tobacco Haven, the loose tobacco itself constituted manufactured cigarettes as defined in RSA 541-C:2, IV, and, thus, the entity that "manufactured" that tobacco (Tobacco Haven's supplier) was responsible for making escrow payments. It also argued in its pleadings that to the extent use of the machines constituted manufacturing cigarettes, the customers who purchased the loose tobacco and cigarette tubes, and then rented and operated the machines, were the only parties who directly produced cigarettes. The State objected to Tobacco Haven's motions, maintaining its position that Tobacco Haven was manufacturing cigarettes on its premises through the sale of loose tobacco, labeled by the supplier as pipe tobacco, in conjunction with the use of the on-site cigarette-making machines. The trial court denied Tobacco Haven's motion to dismiss and granted the State's request for a preliminary injunction "to the extent it is directed at the loose tobacco used in conjunction with the respondent's rolling machine[s], which bears the 'pipe tobacco' label." Tobacco Haven unsuccessfully moved for reconsideration or for interlocutory review by this court. *See* SUP. CT. R. 8.

In January 2010, the State moved for summary judgment, requesting the court to "[i]ssue a permanent injunction barring the sale of cigarettes made using the Respondent's cigarette making machines unless and until the Respondent is in compliance with RSA 541-C and RSA 541-D," and declare that "Tobacco Haven is a Tobacco Products Manufacturer as defined in RSA 541-C." It attached supporting documents, including affidavits authored by two tax auditors of the New Hampshire Department of Revenue Administration who had visited Tobacco Haven and witnessed the manner in which it sold loose tobacco, and the use of the on-site cigarette-making machines. The State's affidavits established that Tobacco Haven was

deliberately selling what was labeled as pipe tobacco for use in its cigarette-making machines in order to, in the words of a Tobacco Haven employee, "get around the tax man." Because the federal tax on pipe tobacco is only $2.83 per pound versus $24.78 per pound for cigarette tobacco, by using pipe tobacco (on which no cigarette escrow payments had been made by the supplier), Tobacco Haven was able to sell the equivalent of a carton of rolled cigarettes through use of the cigarette-making machines for approximately $25.00 — substantially less than the market price of conventionally marketed cigarettes. Tobacco Haven objected to the summary judgment motion, and attached supporting documents, including the affidavit of Joseph Correia, a member and manager of Tobacco Haven.

Before the trial court ruled on the summary judgment motion, the State moved to amend its petition to add RYO as a party. According to the State, Tobacco Haven changed its business model relating to the cigarette-making machines by creating a new entity, RYO, to which it transferred ownership of the machines. The State averred that: (1) Correia owned, through a different corporate entity, the shopping center in which Tobacco Haven is located; (2) he built an enclosure inside a convenience store, located next door to Tobacco Haven, in which RYO operates the machines; (3) RYO's customers enter the premises with their own loose tobacco and cigarette tubes; (4) RYO employees check the tobacco for humidity and also ensure it is not a menthol blend; and (5) customers pay $5.00 to use the machines while RYO employees provide assistance. The State also moved to amend the preliminary injunction order to bind RYO. Over Tobacco Haven's objection, the trial court granted the motion to amend the petition, adding RYO as a party, and the State filed an amended petition. The trial court also scheduled a hearing for May 17, 2010, on the State's motion to amend the preliminary injunction, but the hearing was later cancelled.

On May 14, 2010, the trial court granted the State's motion for summary judgment, ruling that Tobacco Haven was manufacturing cigarettes for purposes of RSA chapter 541-C. It reasoned:

> The process of selling loose untaxed tobacco, which is then immediately rolled into cigarettes retained by the customer in cigarette rolling machines conveniently located on the premises, is clearly a subterfuge to circumvent statutory requirements. . . . Because the pipe tobacco arrives at [Tobacco Haven's] store in loose form and leaves the store as a cigarette, the court need not inquire as to the buyer's intent. The respondent's profit from and participation in the buyer's use of the cigarette rolling machines (regardless of their speed or volume), as evidenced by the actual, physical creation of a cigarette inside the store is enough to deem it manufacturing.

The court issued a permanent injunction that Tobacco Haven "must either refrain from allowing customers to use the cigarette rolling machines in conjunction with pipe tobacco, or make the required escrow payments."

Subsequently, RYO objected to the State's motion to amend the preliminary injunction order, and the State filed a motion requesting the court to clarify that the summary judgment order also applied to RYO and constituted a final judgment ripe for appeal. RYO objected to the motion to clarify, and also filed an answer to the amended petition, including constitutionally-based affirmative defenses and counterclaims. The State objected to the allowance of counterclaims, and filed a replication and answer to the counterclaims. The trial court summarily granted both the State's motion to amend the preliminary injunction order and its motion to clarify that the summary judgment order also applied to RYO. It issued no express ruling regarding the status of RYO's counterclaims. This appeal followed.

### III

In reviewing the trial court's grant of summary judgment, we consider the affidavits and other evidence, and all inferences properly drawn from them, in the light most favorable to the non-moving party. *N. Sec. Ins. Co. v. Connors*, 161 N.H. 645, 649 (2011); *see* RSA 491:8-a (2010). If our review of that evidence discloses no genuine issue of material fact, and if the moving party is entitled to judgment as a matter of law, we will affirm the grant of summary judgment. *N. Sec. Ins. Co.*, 161 N.H. at 649. We review the trial court's application of the law to the facts *de novo. Id.* at 649.

This appeal requires us to conduct statutory construction. In so doing, we first examine the statutory language used, and, where possible, we ascribe to language its plain and ordinary meaning. *See Appeal of Union Tel. Co.*, 160 N.H. 309, 317 (2010). Words and phrases in a statute are construed according to "the common and approved usage of the language" unless from the statute it appears that a different meaning was intended. RSA 21:2 (2000); *see Pheasant Lane Realty Trust v. City of Nashua*, 143 N.H. 140, 142 (1998). Additionally, we interpret language of a statute in the context of the overall statutory scheme and not in isolation, *Appeal of Union Tel. Co.*, 160 N.H. at 317, and seek to effectuate the overall legislative purpose and to avoid an absurd or unjust result, *see Residents Defending Their Homes v. Lone Pine Hunter's Club*, 155 N.H. 486, 488 (2007). We are the final arbiter of the intent of the legislature as expressed in the words of a statute considered as a whole, *Appeal of Union Tel. Co.*, 160 N.H. at 317, and our review of the interpretation of statutes is *de novo, see Appeal of Gamas*, 158 N.H. 646, 648 (2009).

The NPM Act applies to "[a]ny tobacco product manufacturer selling cigarettes to consumers within the state (whether directly or through a distributor, retailer, or similar intermediary or intermediaries)." RSA 541-C:3, I. A "tobacco product manufacturer" means, in pertinent part, "an entity that after the effective date of this chapter directly (and not exclusively through any affiliate) . . . [m]anufactures cigarettes anywhere that such manufacturer intends to be sold in the United States." RSA 541-C:2, IX(a)(1).

Under the statute,

(a) "Cigarette" means any *product* that contains nicotine, is intended to be burned or heated under ordinary conditions of use, and consists of or contains:

(1) Any roll of tobacco wrapped in paper or in any substance not containing tobacco; or

(2) Tobacco, in any form, that is functional in the product, which, because of its appearance, the type of tobacco used in the filler, or its packaging and labeling, is likely to be offered to, or purchased by, consumers as a cigarette; or

(3) Any roll of tobacco wrapped in any substance containing tobacco which, because of its appearance, the type of tobacco used in the filler, or its packaging and labeling, is likely to be offered to, or purchased by, consumers as a cigarette described in subparagraph (a)(1).

(b) The term "cigarette" includes *"roll-your-own"* (i.e., any *tobacco* which, because of its appearance, type, packaging, or labeling is suitable for use and likely to be offered to, or purchased by, consumers as tobacco for making cigarettes). For purposes of this definition of "cigarette," 0.09 ounces of "roll-your-own" tobacco shall constitute one individual "cigarette." ·

RSA 541-C:2, IV (emphases added). Thus, there are two categories of "cigarette" under the statute: a product with certain contents, RSA 541-C:2, IV(a) (rolled cigarette); and certain roll-your-own tobacco, RSA 541-C:2, IV(b) (roll-your-own cigarette).

The respondents advance three arguments on appeal. First, they contend that the loose tobacco used by customers in the cigarette-making machines constitutes fully manufactured roll-your-own cigarettes under RSA 541-C:2, IV(b) at the time the tobacco is purchased from the supplier. Thus,

they contend, the manufacturer-supplier of that loose tobacco is accountable under the NPM Act, and not the purchaser of that tobacco "regardless of what [the purchaser] does with its purchase." Alternatively, the respondents argue that they did not manufacture any rolled cigarettes under RSA 541-C:2, IV(a) because the consumers themselves rent and operate the machines, and thus manufacture the rolled cigarettes for personal consumption. Finally, the respondents argue that the trial court erred when it summarily extended the summary judgment order to RYO, took no action on the amended complaint, and failed to consider RYO's constitutional defenses and counterclaims.

We address the respondents' first two arguments in the context of the facts reviewed by the trial court when it decided the State's summary judgment motion; that is, when the cigarette-making machines were used on Tobacco Haven's premises in conjunction with the consumers' purchases of cigarette tubes and loose tobacco. Thus, at this point, we do not consider the change of circumstances resulting from the two machines being moved from the premises of Tobacco Haven to the next-door premises of RYO.

A

The respondents first contend that the trial court failed to address the essential and dispositive issue of this case: whether the loose tobacco used in the on-site cigarette-making machines already constituted fully manufactured cigarettes as defined in RSA 541-C:2, IV(b) when purchased from the supplier. According to the respondents, it is undisputed that the loose tobacco, while labeled by the supplier as "pipe tobacco," is identical in substance to loose tobacco labeled by the supplier for cigarette use, and, thus, the tobacco necessarily constitutes roll-your-own cigarettes under RSA 541-C:2, IV(b). The respondents contend that brand names for the labeled pipe tobacco are the same as "roll your own" brands listed in the State's directory, and point out that the State initially sought escrow payments from the supplier of the loose tobacco labeled as pipe tobacco that was actually being used by Tobacco Haven customers for making cigarettes in the machines at issue in this case.

Under RSA 541-C:2, IV(b), loose tobacco constitutes a roll-your-own cigarette when due to "its appearance, type, packaging, or labeling" it is (1) "suitable for use" for making cigarettes and (2) "likely to be offered to, or purchased by, consumers as tobacco for making cigarettes." Even assuming that the loose tobacco labeled by the supplier as pipe tobacco is identical in substance to tobacco labeled as cigarette or roll-your-own tobacco, this fact establishes only that the tobacco is "suitable for use" for making cigarettes. It does not necessarily establish that the loose tobacco is "likely to be" offered to, or purchased by, consumers for making cigarettes.

The phrase "likely to be" connotes an eventuality based on the reasonably to be expected use for which the tobacco will be offered to, or purchased by, consumers. Therefore, when assessing whether *a particular entity* is manufacturing tobacco that constitutes roll-your-own cigarettes under RSA 541-C:2, IV(b), the loose tobacco must be considered *from that entity's standpoint*; that is, it must be determined whether the entity should have reasonably expected that the loose tobacco would likely be offered to, or purchased by, consumers for making cigarettes, due to the tobacco's "appearance, type, packaging, *or* labeling." RSA 541-C:2, IV(b) (emphasis added).

The respondents contend that the disjunctive term "or" means that only one of the features (such as "type" or "appearance") need be present for loose tobacco to be deemed roll-your-own cigarettes under the statute. We agree that a single feature could be dispositive in a particular case; however, a single feature is not to be considered in isolation, but in conjunction with other relevant features. Here, the respondents contend that the loose tobacco constituted fully manufactured roll-your-own cigarettes when purchased from the supplier. Thus, we review whether the undisputed facts in this record demonstrate that the manufacturer-supplier should have reasonably expected that the loose tobacco it labeled as pipe tobacco would likely be offered to, or purchased by, consumers for making cigarettes, due to the tobacco's "appearance, type, packaging, or labeling."

Viewed objectively, the supplier's labeling of the loose tobacco as pipe tobacco is a strong signal that it expected such loose tobacco would likely be offered by the retailer to, or purchased by, consumers for pipe use, not for making cigarettes. That the loose tobacco was purportedly identical in substance to that labeled by the supplier for making cigarettes, and that loose tobacco labeled as pipe tobacco was purportedly sold under the same brand name as loose tobacco labeled as cigarette or roll-your-own tobacco, does not justify a conclusion on this record that the supplier should have reasonably expected the retailer would likely offer it to consumers for making cigarettes or that a consumer would likely purchase it for cigarette use in the face of a label identifying it as pipe tobacco. Moreover, the record makes it clear that Tobacco Haven understood by virtue of the price it paid its supplier for the loose tobacco that this was tobacco on which neither the cigarette tax nor cigarette escrow payments had previously been paid, and, thus, the supplier would reasonably expect such tobacco to be offered to, and purchased by, consumers as tobacco for pipe use.

Additionally, we fail to see how the State's pre-litigation conduct of initially seeking escrow payments from the supplier advances the respondents' legal argument. *Cf. Hewes v. Roby*, 135 N.H. 476, 477 (1992) (party

may properly advance alternative legal grounds). Indeed, it appears that the State acted entirely responsibly in initially seeking to collect the escrow payments from the supplier, and that it turned its focus to respondent Tobacco Haven only after it was satisfied the supplier had sold the loose tobacco labeled as pipe tobacco and that it was Tobacco Haven which made the decision to offer that tobacco for use in cigarettes.

■ Accordingly, on this record, we reject the respondents' argument that the loose tobacco constituted fully manufactured cigarettes under RSA 541-C:2, IV(b) when purchased from the supplier. *See Hill-Grant Living Trust v. Kearsarge Lighting Precinct*, 159 N.H. 529, 535 (2009) (to defeat summary judgment, the non-moving party must set forth specific facts showing a genuine issue for trial). We need not decide whether the status of loose tobacco as roll-your-own cigarettes under RSA 541-C:2, IV(b) is not "subject to reclassification by the retailer," as the respondents contend. We note only that the language of the statute does not preclude a construction that allows classification of loose tobacco as cigarettes under RSA 541-C:2, IV(b) based on the conduct of the retailer, objectively viewed, in relation to the loose tobacco being offered for sale. It is not clear whether this legal issue was litigated below, but the trial court, as well as the State in its appellate brief, base the status of Tobacco Haven as a cigarette manufacturer on the production and sale of rolled cigarettes. *See* RSA 541-C:2, IV(a). Therefore, we leave this legal issue for another day.

## B

The respondents next argue that the trial court erred in concluding that Tobacco Haven manufactured rolled cigarettes because a retailer does not become a tobacco product manufacturer "by renting consumers in-store, self-help cigarette filling machines for personal use." They contend that renting on-site machinery is akin to selling cigarette-making machines for home use, where the consumer is the one who is making the rolled cigarettes. The respondents contend that the legislature intended to "regulate the upstream manufacturers of the 'roll your own' rather than downstream retailers" who sell "tobacco, paper tubes and electric home rolling machines to end users." They further distinguish retailers from manufacturers by relying on the statutory requirement under RSA chapter 541-D that entities must identify the "brand families" they manufacture; they argue, "[r]etailers, in contrast, merely sell brands that belong to upstream manufacturers."

There is no dispute that rolled cigarettes were being manufactured on Tobacco Haven's premises; the trial court observed, "the pipe tobacco arrives at [Tobacco Haven's] store in loose form and leaves the store as a cigarette," and the respondents recognize that "there is no doubt that

rolled cigarettes were 'manufactured' on [Tobacco Haven's] premises." The issue is whether the undisputed material facts establish as a matter of law that Tobacco Haven sold consumers rolled cigarettes which *it* manufactured. *See* RSA 541-C:3, I; RSA 541-C:2, IV(a), :IX(a). To analyze this question, we review the ordinary meaning of the statutory language, in the context of the scope and purpose of the NPM Act.

Common definitions of "manufacture," *see* RSA 541-C:2, IX, include: "to make (as raw material) into a product suitable for use"; "to make from raw materials by hand or by machinery"; and "to produce according to an organized plan and with division of labor." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1378 (unabridged ed. 2002); *see also* THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1067 (4th ed. 2006) (the definition of "manufacture" includes: "[t]o make or process (a product), especially with the use of industrial machines"; "[t]o create, produce, or turn out in a mechanical manner"; and "[t]o make or process goods, especially in large quantities and by means of industrial machines"). Further, common definitions for the term "manufacturer" include: "one that manufactures"; "the owner or operator of a factory"; and "one who changes the form of a commodity or who creates a new commodity." WEBSTER'S THIRD NEW INTERNATIONAL, *supra* at 1378; *see also* AMERICAN HERITAGE, *supra* at 1067 (similar definition). Thus, generally speaking, a manufacturer of rolled cigarettes means an entity which or person who makes, creates or produces rolled cigarettes, *see* RSA 541-C:2, IV(a), according to an organized plan, in a mechanical manner and probably by means of industrial machinery.

The scope and purpose of the NPM Act is particularly instructive on whether the legislature intended a retailer like Tobacco Haven to constitute a cigarette manufacturer under the circumstances before us. The statutory term "tobacco product manufacturer" is broadly defined to reach entities that are directly responsible for manufacturing cigarettes and placing them into the stream of commerce in the United States. For example, "[t]obacco product manufacturer" means an entity that "directly (and not exclusively through any affiliate) . . . [m]anufactures cigarettes anywhere that such manufacturer intends to be sold in the United States," or "[i]s the first purchaser anywhere for resale in the United States of cigarettes manufactured anywhere that the manufacturer does not intend to be sold in the United States." RSA 541-C:2, IX(a)(1), (2). Further, when adopting the NPM Act, the legislature declared in part:

> It would be contrary to the policy of the state if tobacco product manufacturers who determine not to enter into such a settlement could use a resulting cost advantage to derive large, short-term

profits in the years before liability may arise without ensuring that the state will have an eventual source of recovery from them if they are proven to have acted culpably. It is thus in the interest of the state to require that such manufacturers establish a reserve fund to guarantee a source of compensation and to prevent such manufacturers from deriving large, short-term profits and then becoming judgment-proof before liability may arise.

RSA 541-C:1, VI. Accordingly, the NPM Act was designed to target commercial entities that are directly responsible for making, creating or producing cigarettes and profit from placing them into the stream of commerce for purchase by consumers in the United States.

With this backdrop, we turn to the undisputed material facts from the summary judgment record. Tobacco Haven purchased, installed and maintained in its retail tobacco shop two cigarette-making machines designed to make cigarettes from loose tobacco and cigarette tubes. Bins of loose tobacco (which had been purchased by Tobacco Haven as "pipe tobacco"), with designated varying levels of strength, were kept in the store, along with cigarette tubes, for customers to purchase in conjunction with using the on-site machines to produce rolled cigarettes. Tobacco Haven employees instructed customers on the appropriate blends or types of tobaccos for achieving a desired cigarette type, such as Marlboro Lights. Customers seeking to purchase cigarettes made by the machines selected the desired loose tobacco, poured it into the top of the machine, and inserted cigarette tubes into the machine. Customers pressed the start button, and each batch created 200 rolled cigarettes (the equivalent of a carton), which were deposited into a plastic bag or some other type of container. For customers unfamiliar with the machine, Tobacco Haven employees instructed them how to use it and provided all necessary guidance. When a machine jammed in the middle of creating a batch, Tobacco Haven employees fixed it and instructed the customer to press the start button again. Tobacco Haven employees generally repaired and maintained the machines. The process of making each batch of cigarettes lasted approximately ten minutes. When a machine failed to produce a full batch, Tobacco Haven employees directed customers to take some individual cigarettes which had been previously made from the machine to complete the batch of 200 cigarettes. When this litigation began, Tobacco Haven charged $19.99 for each batch, which included the loose tobacco, the cigarette tubes and the use of a machine. At the time of summary judgment, a total batch cost $29.99, with a single receipt listing the tubes and tobacco at $24.99 and a $5.00 rental fee for the "RYO Machine."

■ We have no doubt that the trial court correctly concluded that Tobacco Haven was a tobacco product manufacturer selling rolled cigarettes to consumers within the meaning of the NPM Act. The facts, viewed objectively, illustrate that Tobacco Haven, a commercial entity, had an organized business plan to produce in a mechanical manner and with use of industrial-type machines batches of 200 rolled cigarettes and place them into the stream of commerce for consumers to purchase. Tobacco Haven's manufacturing process included displaying various types of loose tobacco for consumer selection, along with cigarette tubes, and providing cigarette-making machines for producing rolled cigarettes with the tubes and selected tobacco. Tobacco Haven's practice of renting the use of its on-site machines does not vitiate its status as an entity that directly manufacturers and sells rolled cigarettes; Tobacco Haven employees informed customers on the appropriate blend of loose tobacco for producing the desired cigarettes, instructed customers on how to use the machines, offered guidance as necessary, fixed the machines when they jammed, maintained the machines, and provided additional rolled cigarettes to complete the order of 200 cigarettes when the machines produced an incomplete batch.

We decline to analyze the merits of the respondents' argument relating to commercial transactions in which Tobacco Haven sells loose tobacco, cigarette tubes and a type of cigarette-making machine for assembly of cigarettes by customers at home. In such transactions, no rolled cigarettes are being manufactured by the commercial entity, see RSA 541-C:2, IV(a), and for reasons set forth earlier, we decline to address whether a retailer can become a manufacturer of roll-your-own cigarettes. See RSA 541-C:2, IV(b). We also decline to address the merits of their arguments that deeming Tobacco Haven a tobacco product manufacturer would give rise to double taxation under RSA chapter 78, and that a retailer's status as a tobacco product manufacturer would result in enforcement difficulties regarding the tobacco tax, because these arguments are based on factual situations that are not before us. Finally, we note that the relationship between the statutory provisions at issue in this case and any related federal regulations is beyond the scope of this litigation.

Accordingly, we affirm the trial court's grant of summary judgment to the extent it enjoined Tobacco Haven "from allowing customers to use the cigarette rolling machines in conjunction with [the sale of] pipe tobacco," unless it makes "the required escrow payments."[2]

---

[2] We note that escrow payments are based on "units sold," see RSA 541-C:3, which are defined in pertinent part as "the number of individual cigarettes sold in the state by the applicable tobacco product manufacturer ... measured by excise taxes collected by the state on packs (or 'roll-your-own' tobacco containers) bearing the excise tax stamp of the state," RSA 541-C:2, X. We recognize that the rolled cigarettes at issue in this case apparently did not bear the excise

## IV

Next, the respondents argue that the trial court erred by summarily extending the summary judgment order on the permanent injunction to RYO without making factual findings specific to RYO, taking no action on the amended complaint, and failing to consider RYO's affirmative defenses and counterclaims. The State contends that the respondents' claim of error is not preserved because once the trial court applied its summary judgment ruling to RYO, the respondents "made no motion to reconsider and took no further action to request further briefing or hearing." It also argues that the trial court did not err because RYO had adequate opportunity to present its constitutional claims to the court for consideration and did so in a meaningful time and manner through its objections to the State's requests.

■ ■ First, we review the chronology and substance of the parties' pleadings before the trial court to determine whether RYO preserved its argument for appellate review. *See Berliner v. Clukay*, 150 N.H. 80, 82-83 (2003) (purpose of requiring a timely objection to preserve issue for appellate review includes affording trial court opportunity to correct an error it may have made, or clearly explain why it did not make an error). Prior to issuing its summary judgment ruling, the trial court apparently had scheduled a hearing on the State's amended petition and motion to amend the preliminary injunction, but later cancelled it. When objecting to the State's requests to extend the preliminary injunction and summary judgment order to it, RYO argued, in part, that the facts relating to its business plan were meaningfully different from the case the State had brought against Tobacco Haven. It set forth this purportedly different fact scenario in its answer to the amended petition, and also raised several constitutionally-based defenses and counterclaims. Also, in its motion to clarify, the State had requested the court to deem the order a final judgment ripe for review, and RYO objected to this motion, noting that its involvement in the litigation was recent. Therefore, in the context of these pleadings, the trial court was aware that it was rendering a final decision against RYO without affording it any further opportunity to litigate the viability of the State's theory of relief, which is the basis for the claim of

---

tax stamp of the state. While we are not convinced that the definition of "units sold" precludes Tobacco Haven from having the status of "tobacco product manufacturer" under RSA chapter 541-C, we do not address how the escrow payment would be calculated under RSA 541-C:3 in the circumstances at issue. We do note, however, that when objecting to the State's request for a preliminary injunction, Tobacco Haven took the position that the State had a complete remedy at law because a monetary award for the State was ascertainable "based on the number of times the machine was used."

error that RYO advances on appeal. Accordingly, we conclude that a motion for reconsideration was not necessary for RYO to preserve its claim of error for appeal.

Therefore, we turn to the merits of respondent RYO's argument. In ruling on the State's motion to amend the preliminary injunction and motion to clarify the summary judgment order, the trial court issued an order simply stating, "Granted. Objection noted." On this record, summarily extending the injunction to RYO was error because factual disputes exist regarding the State's allegation that RYO constitutes a cigarette manufacturer under RSA chapter 541-C.

In its amended petition, as well as in other pertinent pleadings, the State appears to allege that RYO and Tobacco Haven are engaged in a joint enterprise to manufacture cigarettes. For example, the State alleged that Tobacco Haven established "a new entity[, RYO,] which will, in concert with [Tobacco Haven], allow, promote, and encourage their customers to make cigarettes. The new entity and [Tobacco Haven] will both profit from the manufacture of these cigarettes, as customers will purchase tobacco and tubes from [Tobacco Haven] and then take those materials next door to [RYO] and pay to use their machines for the manufacture of the cigarettes." RYO, however, contended that it is a different entity with a different business plan, and that it cannot determine where the customers obtain their loose tobacco for use in the cigarette-making machines. Further, RYO denied the State's allegations that it worked together with Tobacco Haven to manufacture cigarettes. Notably, to substantiate its allegations in its pleadings the State relied on a portion of Corriea's March 31, 2010 deposition, and we cannot say that such evidence conclusively establishes the State's theory for injunctive relief against RYO as a matter of law. *See generally Miami Subs Corp. v. Murray Family Trust and Kenneth Dash Partnership*, 142 N.H. 501, 508 (1997) (joint venture is "an association of two or more persons formed to carry out a single business enterprise for profit" (quotation omitted)); *see also N. Sec. Ins. Co.*, 161 N.H. at 649 (summary judgment must be based on facts in affidavits and other evidence that establish moving party is entitled to judgment as a matter of law); RSA 491:8-a (identifying evidence upon which summary judgment facts are based).

Nevertheless, the trial court summarily granted the State's request to extend the injunction orders to RYO without affording RYO an opportunity to meaningfully litigate the factual allegations underlying the legal theory advanced by the State. The court also summarily extended its summary judgment order to RYO, notwithstanding both that RYO disputed the State's factual allegations and that the State's evidence fails to

conclusively establish its theory for injunctive relief against RYO as a matter of law. Accordingly, we vacate the trial court's decisions granting the State's motions to amend the preliminary injunction and to clarify the summary judgment order.

The respondents also contend that the trial court did not reach the merits of RYO's constitutional claims; they seek to have us remand for trial. The State, however, invites us to address the substance of the constitutional issues in this appeal. The record shows that RYO raised a number of complex constitutional issues, via its affirmative defenses and counterclaims, which were not part of the litigation against Tobacco Haven. Despite its then-pending requests to extend the preliminary and permanent injunctions to RYO, the State sought to preclude RYO's counterclaims on the basis that the constitutional challenges were "not ripe for adjudication" because the court had not yet applied its rulings to RYO, and requested the court to dismiss the counterclaims. When it summarily granted the State's motions to amend and to clarify, the trial court did not expressly address the status of RYO's constitutional claims. Under the circumstances of this case, we conclude that appellate review of the constitutional issues relating to RYO is not presently warranted, and leave them for the trial court's consideration on remand following such further proceedings as the trial court may deem necessary.

## V

In sum, we affirm the trial court's decision granting summary judgment in favor of the State with respect to respondent Tobacco Haven, we vacate its decision granting the State's motions to amend the preliminary injunction and to clarify the summary judgment order regarding respondent RYO, and we remand for further proceedings consistent with this opinion.

*Affirmed in part; vacated in part; and remanded.*

DALIANIS, C.J., and DUGGAN, HICKS and CONBOY, JJ., concurred.