Request of the House of Representatives
No. 92-131

OPINION OF THE JUSTICES (FURLOUGH)

June 10, 1992

The following Resolution No. 61, requesting an opinion of the justices, was adopted by the house of representatives on March 5, 1992, and filed with the supreme court on March 6, 1992:

"Whereas, there is pending in the House of Representatives, House Bill 1058-FN, an act relative to a furlough program for state employees; and

"Whereas, HB 1058-FN requires all state employees whose salary is greater than $15,000 to take unpaid days of leave; and

"Whereas, HB 1058-FN prohibits the use of sick leave, annual leave, bonus leave, floating holidays, compensatory time or any other similar benefit in satisfaction of the unpaid leave requirement; and

"Whereas, many classified state employees are covered by a collective bargaining agreement between the state of New Hampshire and the employees' certified bargaining representative; and

"Whereas, certain questions have arisen concerning the constitutionality of HB 1058-FN; now therefore, be it

"Resolved by the House of Representatives:

"That the Justices of the Supreme Court be respectfully requested to give their opinion on the following questions of law:

1. Whether HB 1058-FN affects the terms of the collective bargaining agreement currently in effect between the state and classified state employees and, if so, whether its effect is to violate the contract clause of the United States Constitution, Art. 1, Sec. 10 or the New Hampshire Constitution, Pt. 1[,] Art. 23?

2. Whether HB 1058-FN affects the terms of appointment currently in effect between the state and unclassified state employees and, if so, whether its effect is to violate the contract clause of the United States Constitution, Art. 1, Sec. 10 or the New Hampshire Constitution, Pt. 1, Art. 23?

3. Whether HB 1058-FN would make a law relative to the terms and conditions of employment of state employees that would super[s]ede a portion of an agreement entered into by the state and classified state employees and, if so, whether it would violate the United States Constitution, Art. 1, Sec. 10 or the New Hampshire Constitution, Pt. 1, Art. 23 by establishing an ex post facto law?

4. Whether HB 1058-FN would make a law relative to the terms and conditions of employment of state employees that would affect the terms of the appointment of unclassified state employees and, if

so, whether it would violate the United States Constitution, Art. 1, Sec. 10 or the New Hampshire Constitution, Pt. 1, Art. 23 by establishing an ex post facto law?

5. Whether HB 1058-FN would make a law relative to the terms and conditions of employment of classified state employees which would super[s]ede the terms of RSA 273-A:5, I(i) or RSA 273-A:11 in such a way as to violate the United States Constitution, Art. 1, Sec. 10 or the New Hampshire Constitution, Pt. 1, Art. 23, by establishing an ex post facto law?

6. Whether HB 1058-FN violates the equal protection clauses of the United States Constitution or the New Hampshire Constitution by applying the provisions of the furlough program only to those employees earning $15,001 or more?

7. Whether the provisions of HB 1058-FN would violate the equal protection clauses of the United States Constitution or the New Hampshire Constitution by providing that retirement and other benefits would be calculated at the salary level which would have been paid had the furlough provisions not been implemented?

That the clerk of the House of Representatives transmit copies of this resolution and copies of HB 1058-FN to the Justices of the New Hampshire Supreme Court."

The following response is respectfully returned:

*To the Honorable House of Representatives:*

The undersigned justices of the supreme court now submit the following replies to your questions of March 5, 1992. Following our receipt of your resolution on March 6, 1992, we invited interested parties to file memoranda with the court on or before April 6, 1992. That date was later extended to April 14, 1992.

House of Representatives Bill (HB) 1058-FN (the bill) is a budget-slashing device intended by the proponents to rescue the State from the prospects of fiscal ruin. In essence, it would require certain State employees to take unpaid leave, thus reducing State expenditures and obviating the possibility of still deeper spending cuts or the imposition of additional taxes. The bill provides:

"1 Employee Furlough Program.

I. Notwithstanding any other provision of law, rule, or regulation to the contrary, during the biennium ending June 30, 1993, each person occupying a permanent full-time classified, unclassified, or nonclassified position, regardless of the branch of government or source of funding, is hereby

required to take unpaid days of leave according to the following schedule:

| Salary Range | Number of Days of Unpaid Leave |
|---|---|
| $15,000 or less | 0 |
| $15,001–$25,000 | 3 |
| $25,001–$40,000 | 5 |
| more than $40,000 | 6 |

II. The periods when such leave is taken shall be decided in consultation with such person's supervisor but no person shall take more than one day of unpaid leave in any one week. For the purpose of this section the requirements to take unpaid leave cannot be satisfied by using sick leave, annual leave, bonus leave, floating holidays, compensatory time or any other similar benefit.

III. The savings from this action shall be lapsed into the salary adjustment fund and the employee benefit adjustment account as appropriate, to revert to the appropriate fund, and, except for federal or other non-state funds, shall not be available for transfer for any purpose.

IV. No employee furloughed according to the provisions of this section shall, for purposes of retirement members average final compensation calculations only, have his salary reduced to an amount less than the employee would have earned had the furlough provisions required by this section not been implemented.

V. No employee shall as a result of the provisions of this section forfeit any benefits relative to annual or sick leave, additional annual leave, bonus leave or longevity pay. An unpaid day of leave taken pursuant to this section shall not in any event be considered a break in service for purposes of determining anniversary dates or for purposes of the continuous service requirements for health and dental insurance coverage.

2 Effective Date. This act shall take effect upon its passage."

We begin our analysis with question one, which asks "[w]hether [the bill] affects the terms of the collective bargaining agreement currently in effect between the state and classified state employees and, if so, whether its effect is to violate the contract clause of the United States Constitution, Art. 1, Sec. 10 or the New Hampshire Constitution, Pt. 1[,] Art. 23?" We answer all parts of this question in the affirmative.

630

Part I, article 23 of the New Hampshire Constitution states: "Retrospective laws are highly injurious, oppressive, and unjust. No such laws, therefore, should be made . . . for the decision of civil causes . . . ." "Retrospective law" has been defined as follows: "'every statute, which takes away or impairs vested rights, acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past . . . .'" *Woart v. Winnick,* 3 N.H. 473, 479 (1826) (quoting *Society v. Wheeler,* 22 F. Cas. 756, 767 (C.C.D.N.H. 1814) (No. 13,156)).

■ Article 1, section 10 of the Federal Constitution, on the other hand, declares that "[n]o state shall . . . pass any . . . law impairing the obligation of contracts . . . ." Although the New Hampshire provision affords more protection than its federal counterpart, *compare United States Trust Co. v. New Jersey,* 431 U.S. 1, 17 (1977) ("[The federal] Contract Clause does not prohibit States . . . from enacting legislation with retroactive effect.") *with Gould v. Concord Hospital,* 126 N.H. 405, 408, 493 A.2d 1193, 1195–96 (1985) (right to assert statute of limitations defense vests once limitations period has run; part I, article 23 prohibits law from operating retroactively to impair that vested right); *see also Society v. Wheeler,* 22 F. Cas. at 767 (where no contract violation is alleged, federal provision does not apply; part I, article 23 may apply if law is retrospective), this court has relied on federal contract clause cases to resolve issues raised under part I, article 23 where contract impairment, and not simply retroactive application of a law, was alleged, *see Smith Insurance, Inc. v. Grievance Committee,* 120 N.H. 856, 862–63, 424 A.2d 816, 820 (1980); *Geldhof v. Penwood Associates,* 119 N.H. 754, 755, 407 A.2d 822, 823 (1979). We therefore understand article I, section 10 and part I, article 23 to offer equivalent protections where a law impairs a contract, or where a law abrogates an earlier statute that is itself a contract, *see United States Trust Co. v. New Jersey,* 431 U.S. at 17 n.14 ("[W]hen the language and circumstances evince a legislative intent to create private rights of a contractual nature enforceable against the State," the "statute is itself treated as a contract."). For convenience, the phrase "contract clause of the New Hampshire Constitution" or the like will designate that portion of part I, article 23 which duplicates the protections found in the contract clause of the United States Constitution.

■ The first part of question one, asking whether the bill affects the terms of the collective bargaining agreement (the CBA), articulates the first step in any contract clause analysis. There can be no

contract clause violation unless it is first shown that a contract has been substantially altered. *See Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411 (1983); *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978). "This inquiry has three components: whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial." *General Motors Corp. v. Romein,* — U.S. —, —, 112 S. Ct. 1105, 1109 (1992).

There appears to be no question that a contract exists between the State and certain classified employees. The CBA referenced in question one was made and entered into by the State and the State Employees' Association of New Hampshire, Inc., SEIU Local 1984, AFL–CIO, CLC, which is described in section 1.1 of the CBA as the exclusive representative of "all classified employees in the bargaining unit with the exception of those classified employees excluded from the definition of public employee under the provisions of RSA 273-A:1, IX," and its preamble declares that the parties intend to be bound by its provisions. *See generally* RSA 273-A:9 (authorizing negotiation of terms and conditions of employment between State and bargaining units representing State employees). The main dispute instead centers around the issue of impairment: the memoranda of the speaker of the house of representatives (the speaker) and the attorney general both contend that the bill would not actually affect the terms of the CBA.

More specifically, the speaker and the attorney general argue first that no part of the CBA is altered by the furlough requirement, because the CBA does not guarantee a minimum amount of work for the covered employee. Rather, they contend, it only guarantees rates of pay. We disagree. The preamble and section 6.1 of the CBA state:

> "In consideration of the mutual covenants herein set forth, the parties hereto intending to be bound hereby, agree as follows: . . . . The basic workweek for every full-time clerical, supervisory and professional employee in the state classified service in each unit, *with due allowance for authorized holidays and leaves of absence with pay, shall* be thirty-seven and one half (37½) hours per week."

(Emphasis added.) Similar provisions for full-time trade, custodial, and law enforcement workers are contained in subsections 6.1.1 and 6.1.2, and while the CBA provides for overtime pay in certain circumstances, it does not contemplate less pay. We find no room in the plain language quoted above for the arguments proffered by the speaker and the attorney general.

■ The speaker and the attorney general next contend that forced unpaid leave is allowable under the CBA as a management prerogative and that consequently the provisions of the bill do not affect the CBA's terms. Again, however, the language of the CBA contradicts this argument. Section 2.1 states: "The Employer retains all rights to manage, direct and control its operations in all particulars, *subject to* the provisions of law, personnel regulations and *the provisions of this Agreement,* to the extent that they are applicable." (Emphasis added.) This section unambiguously allows the exercise of "management prerogative" only where doing so does not violate the terms of the CBA. Thus, the State cannot draw independent authority from section 2.1 to usurp the guarantee of a minimum work week granted in section 6.1.

The attorney general's reliance on *Appeal of International Association of Firefighters, AFL–CIO,* 123 N.H. 404, 462 A.2d 98 (1983), to support its "managerial prerogative" argument is misplaced. That case simply held that under RSA 273-A:1, XI, which defines "managerial policy within the exclusive prerogative of the public employer," personnel staffing is not a mandatory subject of collective bargaining. *Id.* at 408, 462 A.2d at 101. It did not condone a decrease in staffing during the effective term of a contract, as the attorney general apparently argues. In fact, the procedural history of the case reveals that before the parties' contract expired, the city-employer limited the employees' vacation choices, decreased the number of firefighters in certain platoons, and required other employees to work "straight time" as "untrained" firefighters. In an unappealed decision, the arbitrator below found that "most of the newly implemented practices violated the working agreement" between the parties. *Id.* at 406, 462 A.2d at 99.

The speaker and the attorney general also cite the CBA's "emergency" provisions in defense of the bill. Subsection 2.1.6 allows the State to take "whatever actions may be *necessary* to carry out the mission of the department in situations of emergency, the determination of such situations to be the prerogative of the [State]." (Emphasis added.) Even assuming that the current fiscal predicament is an emergency and that forcing State workers to take unpaid leave is necessary to carry out the mission of a department, we still cannot accept the speaker's and attorney general's argument. Subsection 2.1.6's "emergency" provision is a portion of section 2.1, defining "managerial prerogatives." As explained above, the State may not exercise this prerogative if in doing so it violates any provision of the CBA.

■ The attorney general next contends that because the CBA does not mention forced unpaid leave, this silence must be construed against the employees. Even the case the attorney general cites in support of this argument, however, *Fertilizing Co. v. Hyde Park*, 97 U.S. 659 (1878), states that "[n]othing is to be taken as conceded but what is given in unmistakable terms, *or by an implication equally clear.*" *Id.* at 666 (emphasis added). The CBA plainly guarantees a work week of a certain length, with allowances made only for holidays and paid leave. Forcing workers to take unpaid leave just as plainly violates the contract. If we were to condone such a violation merely because the issue of mandatory furloughs is not explicitly discussed in the CBA, then we would also have to allow the State unilaterally to cancel accrued sick leave or reduce rates of pay, as neither of these practices are specifically forbidden by the contract.

■ Finally, the attorney general maintains in its memorandum that "[t]he CBA does not create an employment contract for state employees for any definite period of time [and therefore] . . . state employees do not have a vested right in future wages for future services for which the State has decided not to pay." To answer this argument, we simply point to the title page of the CBA, which reads "1989–1991," and section 21.1, which states: "This Agreement as executed by the Parties is effective July 1, 1989 and shall remain in full force and effect through June 30, 1991 or until such time as a new Agreement is executed." The attorney general has not offered an explanation why this language should be ignored, and we can discern none.

■ Having found that the bill impairs the CBA, we next ask whether the impairment is substantial. *See General Motors Corp. v. Romein,* — U.S. at —, 112 S. Ct. at 1109.

> "The severity of an impairment of contractual obligations can be measured by the factors that reflect the high value the Framers placed on the protection of private contracts. Contracts enable individuals to order their personal and business affairs according to their particular needs and interests. Once arranged, those rights and obligations are binding under the law, and the parties are entitled to rely on them."

*Allied Structural Steel Co. v. Spannaus*, 438 U.S. at 245; *cf. Home Bldg. & L. Assn. v. Blaisdell*, 290 U.S. 398, 427–28 (1934) (instability of affairs resulting from laws impairing contracts motivated inclu-

sion of contract clause in Federal Constitution); *Ogden v. Saunders*, 25 U.S. (12 Wheat.) 212, 354–55 (1827) (Marshall, C.J., dissenting) (same). In a recent case involving a New York lag payroll law, the Second Circuit Court of Appeals explained its finding of substantial contract impairment:

> "The affected employees have surely relied on full pay-checks to pay for such essentials as food and housing. Many have undoubtedly committed themselves to personal long-term obligations such as mortgages, credit cards, car payments, and the like—obligations which might go unpaid in the months that the [law] has its immediate impact."

*Ass'n of Surrogates v. State of N.Y.*, 940 F.2d 766, 772 (2d Cir. 1991) (holding lag payroll law unconstitutional as violative of the federal contract clause); *see also State v. Vashaw*, 113 N.H. 636, 637–38, 312 A.2d 692, 693 (1973) ("The underlying policy of this prohibition is to prevent the legislature from interfering with the expectations of persons as to the legal significance of their actions taken prior to the enactment of a law."). The bill under consideration here impairs the very heart of an employment contract: the promise of certain work for certain income. Its impact would likely wreak havoc on the finances of many of the affected workers and can only be considered substantial.

■ Because the bill substantially impairs the contract between the State and certain classified employees, it violates the literal terms of the contract clauses of the State and Federal Constitutions. Nevertheless, "it is to be accepted as a commonplace that the Contract Clause does not operate to obliterate the police power of the States." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. at 241; *see also Manigault v. Springs*, 199 U.S. 473, 480 (1905). "If the Contract Clause is to retain any meaning at all, however, it must be understood to impose *some* limits upon the power of a State to abridge existing contractual relationships, even in the exercise of its otherwise legitimate police power." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. at 242. Thus, a balancing of the police power and the rights protected by the contract clauses must be performed, and a bill or law which substantially impairs a contractual obligation may pass constitutional muster only if it is "reasonable and necessary to serve an important public purpose." *United States Trust Co. v. New Jersey*, 431 U.S. at 25.

"Unless the State itself is a contracting party, . . . '[a]s is customary in reviewing economic and social regulation, . . . courts properly

defer to legislative judgment as to the necessity and reasonableness of a particular measure.'" *Energy Reserves Group v. Kansas Power & Light*, 459 U.S. at 412–13 (quoting *United States Trust Co. v. New Jersey*, 431 U.S. at 22–23). But where the State attempts to abridge its own contract,

> "complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake. A governmental entity can always find a use for extra money, especially when taxes do not have to be raised. If a State could reduce its financial obligations whenever it wanted to spend the money for what it regarded as an important public purpose, the Contract Clause would provide no protection at all."

*United States Trust Co. v. New Jersey*, 431 U.S. at 26; *see also Energy Reserves Group v. Kansas Power & Light*, 459 U.S. at 412 n.14 ("When a State itself enters into a contract, it cannot simply walk away from its financial obligations. In almost every case, the Court has held a governmental unit to its contractual obligations when it enters financial or other markets.").

The speaker contends in his memorandum that "the public interest in achieving fiscal stability and a desire on the part of the Legislature to do so at the least cost to the operation of state government and its employees constitutes a sufficient public interest to justify any potential impairment of a contract." The attorney general makes a similar argument. A State, however, "cannot refuse to meet its legitimate financial obligations simply because it would prefer to spend the money to promote the public good rather than the private welfare of its creditors." *United States Trust Co. v. New Jersey*, 431 U.S. at 29. As the Washington Supreme Court stated:

> "Financial necessity, though superficially compelling, has never been sufficient of itself to permit states to abrogate contracts. '[A] State is not completely free to consider impairing the obligations of its own contracts on a par with other policy alternatives.' . . . If governments could reduce their financial obligations whenever an important public purpose could be conceived for repudiating a contract 'the Contract Clause would provide no protection at all.'"

*Carlstrom v. State*, 103 Wash. 2d 391, 396, 694 P.2d 1, 5 (1985) (quoting *United States Trust Co. v. New Jersey*, 431 U.S. at 26, 30–31). "The contract clause, if it is to mean anything, must prohibit [the

State] from dishonoring its existing contractual obligations when other policy alternatives are available." *Ass'n of Surrogates v. State of N.Y.*, 940 F.2d at 774.

■ Based on the ample authority cited above, we find the bill neither reasonable nor necessary to serve an important public purpose. *See United States Trust Co. v. New Jersey*, 431 U.S. at 25. The legislature has many alternatives available to it, including reducing non-contractual State services and raising taxes and fees. Although neither of these choices may be as politically feasible as the furlough program, the State cannot resort to contract violations to solve its financial problems. Professor Tribe explains:

> "For its own purposes, a government may find it convenient, sometimes indeed imperative, to signal its trustworthiness and thus to induce the sort of reliance that it could instead have spurned. When government makes that choice, a powerful argument may be advanced that the most basic purposes of the impairment clause, as well as notions of fairness that transcend the clause itself, point to a simple constitutional principle: *government must keep its word.*"

L. TRIBE, AMERICAN CONSTITUTIONAL LAW 470 (1978) (footnote omitted).

We next turn to question two, which asks whether the bill "affects the terms of appointment currently in effect between the state and unclassified state employees and, if so, whether its effect is to violate the contract clause of the United States Constitution, Art. 1, Sec. 10 or the New Hampshire Constitution, Pt. 1, Art. 23?" As a preliminary matter, we note that while the bill extends its scope to "classified, unclassified, [and] nonclassified" workers, the request of the house of representatives refers only to "classified" and "unclassified" employees. Neither "unclassified" nor "nonclassified" is defined anywhere in the bill, the request of the house of representatives, or our State statutes. *Cf.* RSA 94:1-a, III, IV (Supp. 1991) (apparently referring to State officers listed in RSA 94:1-a, I, as "unclassified" employees); RSA 21-I:49 (Supp. 1991) (defining "classified service" in terms of those exempt from the service, making no distinction between "unclassified" and "nonclassified" employees). For purposes of this question then, we assume the house of representatives uses the term "unclassified" to mean State workers who are not "classified"; in other words, the exempted employees listed in RSA 21-I:49 (Supp. 1991).

The phrase "terms of appointment" in question two presents another interpretative problem. By asking whether the bill affects "un-

classified" employees' "terms of appointment," the house of representatives appears to have further narrowed the scope of its question to those "unclassified" employees who are appointed to their positions; that is, State officials or officers. *See* N.H. CONST. pt. II, art. 5 (granting legislature power "to name and settle" . . . "all civil officers" except those named and settled pursuant to other articles of constitution); N.H. CONST. pt. II, art. 46 (granting governor and council power to appoint "[a]ll judicial officers, the attorney general, and all officers of the navy, and general and field officers of the militia"). We therefore confine our discussion to the bill's impact on the rights of State officials or officers under the contract clauses of the State and Federal Constitutions. Precisely who is a "State official or officer" is not before us and we do not attempt to answer this question here. *Cf.* RSA 94:1-a, I (Supp. 1991) (listing over 150 State officers and each officer's compensation, but not purporting to provide exhaustive list of State officers; justices and their salaries not named); RSA 491-A:1 (Supp. 1991) (specifying judicial salaries).

RSA 4:1 provides in part:

> "No state official who is not a classified employee shall be discharged or removed except for malfeasance, misfeasance, inefficiency in office, incapacity or unfitness to perform his duties, or for the good of the department, agency or institution to which he is assigned, according to the procedures set out in this section, unless otherwise provided by law."

*See also* N.H. CONST. pt. II, art. 73 (providing that commissioned officers may be removed by governor and council only for reasonable cause and upon address of both houses of legislature); *cf.* N.H. CONST. pt. II, art. 59 ("Permanent and honorable salaries shall be established by law, for the justices of the superior court [and the supreme court]."). We interpreted this statute in *King v. Thomson*, 119 N.H. 219, 400 A.2d 1169 (1979), as granting State officials a continuing property interest in their employment. *Id.* at 221, 400 A.2d at 1171. Thus, an official appointed while RSA 4:1 remains effective is entitled to rely on the rights conferred by that statute and may not be discharged or removed except in accordance with its strictures. *See Blake v. State*, 115 N.H. 431, 434, 343 A.2d 223, 225 (1975); *compare King v. Thomson*, 119 N.H. at 221, 400 A.2d at 1171 (RSA 4:1 confers protected property right on State officials) *with Dodge v. Board of Education*, 302 U.S. 74, 78–79 (1937) (where law merely fixes salaries of officers, no contract is created and compensation named may be altered at will of legislature).

■ As the power to furlough State officials is the power to remove them from their positions piecemeal, we conclude that the bill violates RSA 4:1. It thus impairs vested rights and affects the terms of appointment between the State and State officials. *See King v. Thomson,* 119 N.H. at 221, 400 A.2d at 1171; *cf. Jeannont v. N.H. Personnel Comm'n,* 118 N.H. 597, 601–02, 392 A.2d 1193, 1196 (1978) (employee benefits become vested at time one becomes a permanent State employee or continues in such employment; relating to classified employees); *see also Society v. Wheeler,* 22 F. Cas. at 767; *Petition of Public Serv. Co. of N.H.,* 130 N.H. 265, 280, 539 A.2d 263, 271–72 (1988); *Clark v. Clark,* 10 N.H. 380, 386 (1839). These vested rights are equivalent to contractual obligations owed by the State. *See United States Trust Co. v. New Jersey,* 431 U.S. at 17 n.14; *Dartmouth College v. Woodward,* 17 U.S. (4 Wheat.) 518, 629 (1819) ("contracts" within protection of article I, section 10 are "those which respect property, or some object of value, and confer rights which may be asserted in a court of justice"). Consequently, we find that the bill impairs State officials' contractual rights, just as it impairs the CBA. As explained above in our discussion of question one, this impairment is substantial and violates the contract clauses of the Federal and State Constitutions.

■ Questions three, four, and five all ask whether the bill would establish an ex post facto law in violation of part I, article 23 of the New Hampshire Constitution and article I, section 10 of the United States Constitution. The ex post facto clauses of these Constitutions pertain only to criminal cases, not civil cases, and thus are inapplicable here. *See Calder v. Bull,* 3 U.S. (3 Dall.) 386, 396 (1798); *Society v. Wheeler,* 22 F. Cas. at 767; *Opinion of the Justices,* 131 N.H. 573, 582, 558 A.2d 454, 459 (1989); *Woart v. Winnick,* 3 N.H. at 474–75.

Questions six and seven each ask whether the bill violates the equal protection provisions of the State and Federal Constitutions. Our answers to questions one and two establish that the bill, if enacted into law, would be unconstitutional. As our response to an equal protection inquiry could not alter this conclusion, we respectfully request that we be excused from answering questions six and seven.

We make one further observation. The speaker, in his April 14, 1992 memorandum argues that ". . . it is important to note the distinction between action taken by the executive branch and that taken by the legislative branch [under RSA 273-A]." Although for purposes of this opinion we assume that section 21.1 of the CBA was approved

by the legislature, on the record available to us in rendering this *Opinion of the Justices*, we cannot decide factual issues related to the legislature's approval of cost items in the CBA. Therefore, our opinion is limited by the above assumption.

DAVID A. BROCK
WILLIAM F. BATCHELDER
WILLIAM R. JOHNSON
W. STEPHEN THAYER, III
SHERMAN D. HORTON, JR.

June 10, 1992

*John P. Arnold*, attorney general (*Daniel J. Mullen*, assistant attorney general, on the memorandum), filed a memorandum in support of negative answers to the questions presented.

*The Speaker of the House of Representatives, Harold W. Burns*, by the House Legal Counsel, *Loretta S. Platt*, filed a memorandum in support of negative answers to the questions presented.

*Cook & Molan, P.A.*, of Manchester (*Richard E. Molan & a.*), on behalf of the State Employees' Association of New Hampshire, Inc., Local 1984, SEIU, AFL–CIO, CLC, and *Carol R. Golubock*, of Washington, D.C., on behalf of Service Employees International Union, AFL–CIO, CLC, filed a joint memorandum in support of affirmative answers to questions 1, 3, and 5–7.

*Douglas & Douglas*, of Concord (*Charles G. Douglas, III*), filed a memorandum on behalf of the Association of Unclassified Employees in support of an affirmative answer to question 2.

*James F. Allmendinger*, of Concord, filed a memorandum on behalf of NEA-New Hampshire in support of an affirmative answer to question 1.