Strafford
No. 2010-714

RAYMOND A. CLOUTIER *& a.*

v.

STATE OF NEW HAMPSHIRE *& a.*

Argued: August 26, 2011
Opinion Issued: March 30, 2012

446

*Devine, Millimet & Branch, P.A.*, of Manchester (*Ovide M. Lamontagne* and *Joshua M. Wyatt* on the brief, and *Mr. Lamontagne* orally), for the petitioners.

*Michael A. Delaney*, attorney general (*Anne M. Edwards*, associate attorney general, and *Laura E.B. Lombardi*, assistant attorney general, on the brief, and *Ms. Edwards* orally), for the State.

*Douglas, Leonard & Garvey, P.C.*, of Concord (*Charles G. Douglas, III* and *David M. Howe* on the brief, and *Mr. Douglas* orally), for the Board of Trustees of the New Hampshire Judicial Retirement Plan.

*David R. Connell*, of Concord, *Theodore E. Comstock*, of Concord, and *Betsy B. Miller*, of Concord, on the joint brief, for New Hampshire Local Government Center, New Hampshire School Boards Association and New Hampshire Association of Counties, as *amici curiae*.

HORTON, J., retired, specially assigned under RSA 490:3. The State appeals the Superior Court's (*Brown*, J.) ruling that RSA chapter 100-C (Supp. 2011), the Judicial Retirement Plan, violates Part I, Article 23 of the New Hampshire Constitution. The petitioner and intervenors cross-appeal the court's ruling that salary raises provided for by Laws 2003, 311:3 and Laws 2005, 177:96 should not be included in calculating benefits under the prior retirement statutes. We affirm in part, reverse in part, and remand.

The petitioner, Raymond A. Cloutier, is a retired probate court judge. The six intervenors are retired supreme, superior, probate, and district court judges. We refer to them collectively as the petitioners. In October

2008, Cloutier submitted a written request to the Board of Trustees of the New Hampshire Judicial Retirement Plan (board) asserting that his retirement allowance was erroneously calculated pursuant to RSA chapter 100-C, and that he was entitled to benefits under the retirement statutes that were in effect when he was appointed to be a judge. The board denied his claim and Cloutier filed a petition for writ of certiorari in the superior court. The parties subsequently filed cross-motions for summary judgment.

In response to the trial court's order, the parties filed a joint stipulation containing a chart with projected lifetime retirement payouts for Cloutier. The projected payouts included several separate calculations, comparing retirement benefits under the plan enacted pursuant to RSA chapter 100-C and the previous retirement statutes repealed by Laws 2003, 311:10. The parties disputed certain assumptions underlying the calculations, but not the mathematical calculations within the projections. As the stipulation provides,

> The Parties stipulate that *only* the mathematical calculations . . . are fair and accurate, and fully reserve the right to challenge the propriety of the following assumptions as a matter of law, so that the court may find that there are no genuine issues of material fact in dispute and rule on the following questions of law . . . :
>
> a. Whether the 10% raise given by Laws 2003, 311:3 should be included in calculating and projecting retirement benefits under the old plan;
>
> b. Whether the 1.01% raise given by Laws 2005, 177:96 should be included in calculating and projecting retirement benefits under the old plan;
>
> c. Whether future legislative salary increases are more appropriately determined by the average of salary increases given to sitting probate judges in the period since the new plan's inception (from January 1, 2005 forward), or, alternatively, the average [of] all legislative salary increases given to sitting probate court judges from 1991 to present;
>
> d. Whether Laws 2003, chapter 311 and subsequent amendments to RSA chapter 100-C constitute a "substantial impairment" of Petitioner's and Intervenors' retirement benefits within the meaning of Part I, Article 23 of the State Constitution.

Following a hearing, the trial court granted summary judgment for the petitioners, concluding that the application of RSA chapter 100-C to judges

who accepted their positions before its enactment results in impairment of contract rights in violation of the New Hampshire Constitution. The trial court, however, rejected the petitioners' assertion that the ten percent and one percent salary increases authorized in 2003 and 2005 should be included in calculating their benefits under the prior retirement statutes. This appeal followed.

The State raises two issues on appeal: (1) whether the trial court erred in ruling that RSA chapter 100-C violates Part I, Article 23 of the New Hampshire Constitution; and (2) in the event the trial court's ruling is upheld, whether RSA chapter 100-C is unconstitutional only as applied to judges who met the service and age requirements for retirement as of January 1, 2005. The petitioners cross-appeal, arguing that the trial court erred in ruling that the 2003 and 2005 salary raises are not properly included as "currently effective annual salary" when calculating their retirement benefits.

Prior to the enactment of RSA chapter 100-C, a series of statutes provided for retirement benefits to judges who retired after meeting specific service and age requirements. *See* RSA 490:2 (1977) (repealed 2003) (supreme court); RSA 491:2 (1977) (repealed 2003) (superior court); RSA 502-A:6-a (1977) (repealed 2003) (district court); RSA 547:2-a (1997) (amended 2003) ("Full-time probate judges . . . shall be entitled to the same disability and retirement benefits as full-time justices of the district court"). When the petitioners were appointed to be judges, the prior retirement statutes were in effect.

Under the prior retirement statutes, as "additional compensation for services rendered and to be rendered," a judge who retired upon attaining the age of seventy years having served as a judge for at least seven years, or upon attaining the age of sixty-five years having served for at least ten years, was entitled to receive for the rest of his or her life an annual amount equal to seventy-five percent of "the currently effective annual salary of the office" from which the judge was retired. RSA 502-A:6-a, III (repealed 2003); RSA 490:2, II (repealed 2003); RSA 491:2, II (repealed 2003). The statutes provided that a "sum sufficient to pay any and all benefits or compensation . . . is hereby continually appropriated therefor" and that the "governor is authorized to draw his warrant for the payment thereof out of any funds in the treasury not otherwise appropriated." RSA 490:2, VI (repealed 2003); RSA 491:2, VI (repealed 2003); RSA 502-A:6-a, VI (repealed 2003).

In 2003, the prior retirement statutes were repealed and replaced with RSA chapter 100-C. *See* Laws 2003, ch. 311. Implementation of the new statute was delayed until the Internal Revenue Service made a favorable determination as to the tax qualified status of the plan. *See* Laws 2003,

311:11. The parties have stipulated that RSA chapter 100-C took effect on January 1, 2005. Between 2006 and 2009, the petitioners retired from full-time service.

Under the new retirement statute, membership in the judicial retirement plan is mandatory for any full-time supreme, superior, district or probate court judge. RSA 100-C:3. Retirement benefits are established as follows:

> I. Any member who has at least 15 years of creditable service and is at least 60 years of age, or who has at least 10 years of creditable service and is at least 65 years of age, or who has at least 7 years of service and is 70 years of age may retire on a service retirement allowance . . . .

> II. A member who is at least 65 years of age with 10 years of creditable service may retire on a service retirement allowance equal to 75 percent of the member's final year's salary.

> III. A member who is 70 years of age with 7 years of creditable service may retire on a service retirement allowance equal to 45 percent of the member's final year's salary. A member who is 70 years of age shall be granted an additional 10 percent over the 45 percent level for each year of creditable service the member has over 7 years.

> IV. A member who is at least 60 years of age with at least 15 years of service may retire on a service retirement allowance equal to 70 percent of the member's final year's salary. A member who has at least 15 years of service and is at least 60 years of age shall be granted an additional percent over the 70 percent level for each year of continued service over 15 years.

> V. Under no circumstance shall any service retirement allowance pursuant to this section exceed 75 percent of the member's final year's salary.

> VI. Any member attaining eligibility for 75 percent of the member's final year's salary shall not be required to make employee contributions to the plan pursuant to RSA 100-C:14.

RSA 100-C:5, I-VI.

The new retirement plan is self-funding, relying upon contributions from the State and the judges. *See* RSA 100-C:13. Although the new retirement statute limits benefits to seventy-five percent of the judge's final year's

salary, the board has the discretion to award cost-of-living adjustments to retired judges up to an aggregate amount of $50,000 per year, and to award more than that amount with the approval of the legislature. RSA 100-C:13, III(g); RSA 100-C:17. The legislature may approve cost-of-living adjustments in excess of $50,000 only if the plan's annuity fund earns at a level greater than the actuarial assumed rate of return approved by the board and the trust is at least ninety percent funded for the calendar year. RSA 100-C:17.

■ The State argues that the trial court erred in finding a violation of Part I, Article 23 of the State Constitution because the prior retirement statutes did not create contractual rights and, even if they did, those rights have not been substantially altered by RSA chapter 100-C. Because the parties rely only upon the State Constitution, we need not engage in a separate federal analysis. *See Petition of Guardarramos-Cepeda*, 154 N.H. 7, 9 (2006).

> In reviewing the trial court's grant of summary judgment, we consider the affidavits and other evidence, and all inferences properly drawn from them, in the light most favorable to the non-moving party. If our review of that evidence discloses no genuine issue of material fact, and if the moving party is entitled to judgment as a matter of law, we will affirm the grant of summary judgment. We review the trial court's application of the law to the facts *de novo*.

*State v. N. of the Border Tobacco*, 162 N.H. 206, 212 (2011) (citations omitted).

Whether or not a statute is constitutional is a question of law, which we review *de novo*. *Tuttle v. N.H. Med. Malpractice Joint Underwriting Assoc.*, 159 N.H. 627, 640 (2010).

> The party challenging a statute's constitutionality bears the burden of proof. The constitutionality of an act passed by the coordinate branch of the government is presumed. It will not be declared to be invalid except upon inescapable grounds; and the operation under it of another department of the state government will not be interfered with until the matter has received full and deliberate consideration.

*Id.* (quotations, citations and brackets omitted).

■■ Part I, Article 23 of the New Hampshire Constitution provides: "Retrospective laws are highly injurious, oppressive, and unjust. No such

laws, therefore, should be made, either for the decision of civil causes, or the punishment of offenses." Although this provision does not specifically reference existing contracts, "we have held that its proscription duplicates the protections found in the contract clause of the United States Constitution." *State v. Fournier*, 158 N.H. 214, 221 (2009) (quotation omitted). "We therefore understand article I, section 10 [of the Federal Constitution] and part I, article 23 [of the State Constitution] to offer equivalent protections where a law impairs a contract, or where a law abrogates an earlier statute that is itself a contract." *Opinion of the Justices (Furlough)*, 135 N.H. 625, 630 (1992). Accordingly, "every statute which takes away or impairs vested rights, acquired under existing laws, . . . must be deemed retrospective" within the meaning of Part I, Article 23. *Tuttle*, 159 N.H. at 641 (quotation omitted).

Contract Clause analysis in New Hampshire requires a thresh-old inquiry as to whether the legislation operates as a substantial impairment of a contractual relationship. This inquiry has three components: whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial. If the legislation substantially impairs the contract, a balancing of the police power and the rights protected by the contract clause[] must be performed, and the law may pass constitutional muster only if it is reasonable and necessary to serve an important public purpose.

*Id.* (quotations, citations, ellipses and brackets omitted).

Whether a public retirement plan creates a contract between a public employee and the State is a question of first impression in New Hampshire. "The nature of pension rights of a public employee is a question which has caused courts great difficulty." *Wagoner v. Gainer*, 279 S.E.2d 636, 640 (W. Va. 1981). "Development of the law on the question has been long and tort[u]ous, reflecting the increasing pressure placed upon the judiciary by the evolution of the now generally accepted theory that pensions are a part of the compensation of an employee to which, under ordinary circum-stances, he is as much entitled as he is to the wages paid him for the work he has actually performed." *Id.* (quotation and ellipses omitted).

██ █ Regarding public employees, we have recognized that

[a]n employee's compensation is not necessarily limited to his salary, but will include any other benefits that are an integral part of the employee's contemplated compensation. These benefits may include . . . retirement . . . benefits. Such benefits are a means by which the State can attract qualified persons to enter and

remain in State employment, and an employee accepts an offer of employment or continues in employment with the State in reliance on the State's representations that it will provide such benefits. These benefits are an integral part of the contemplated compensation and become vested at the time one becomes a permanent State employee or continues in such employment.

*Jeannont v. N.H. Personnel Comm'n*, 118 N.H. 597, 601-02 (1978). We have also held that RSA chapter 100-A, establishing the New Hampshire Retirement System, "clearly entitles certain governmental employees to receive retirement and other related benefits." *State Employees' Ass'n of N.H. v. Belknap County*, 122 N.H. 614, 621 (1982). "These benefits constitute a substantial part of an employee's compensation and become vested upon the commencement of permanent employee status. Designed to attract competent individuals into government service, the benefits are essentially created for the protection of the employee and his family." *Id.* (citations omitted); *see also Gilman v. County of Cheshire*, 126 N.H. 445, 448-49 (1985) (right to receive sick leave benefits vests when one becomes a governmental employee or continues in such employment). One of the primary purposes of providing benefits to public employees is "to induce competent persons to enter and *remain* in public employment. Benefits would serve as little inducement if they could be whisked away at the whim of the public employer." *Gilman*, 126 N.H. at 449.

██ In support of the statement in *Jeannont* that "benefits are an integral part of the contemplated compensation and become vested at the time one becomes a permanent State employee or continues in such employment," *Jeannont*, 118 N.H. at 602, we cited *Kern v. City of Long Beach*, 179 P.2d 799 (Cal. 1947), and *Bakenhus v. City of Seattle*, 296 P.2d 536 (Wash. 1956). In *Kern*, the Supreme Court of California reasoned that "public employment gives rise to certain obligations which are protected by the contract clause of the Constitution, including the right to the payment of salary which has been earned. Since a pension right is an integral portion of contemplated compensation, it cannot be destroyed, once it has vested, without impairing a contractual obligation." *Kern*, 179 P.2d at 802 (quotation and citation omitted). In *Bakenhus*, the Supreme Court of Washington rejected as "insupportable" the view that since the right to receive a pension does not arise until all the conditions are fulfilled, the employee's rights must depend upon the law as it exists at that time. *Bakenhus*, 296 P.2d at 539. Rather, the court adopted the "more enlightened" view that "the employee who accepts a job to which a pension plan is applicable contracts for a substantial pension and is entitled to receive the same when he has fulfilled the prescribed conditions." *Id.* at 540.

■ Other state supreme courts that have been presented with this issue have held that a judge's pension rights are an integral element of compensation and a vested contractual right accruing upon acceptance of employment. *See, e.g., Board of Tr. of Pub. Emp. Ret. F. v. Hill*, 472 N.E.2d 204, 208-09 (Ind. 1985); *Gainer*, 279 S.E.2d at 643; *Olson v. Cory*, 636 P.2d 532, 535-36 (Cal. 1980); *Miles v. Tenn. Consol. Retirement System*, 548 S.W.2d 299, 304 (Tenn. 1976); *Sylvestre v. State*, 214 N.W.2d 658, 664-65 (Minn. 1973); *Campbell v. Michigan Judges Retirement Board*, 143 N.W.2d 755, 757-58 (Mich. 1966). As the Minnesota Supreme Court explained:

> [A] judge gives up the right to continue in the only field of endeavor in which he has been educated and is experienced in order to accept a position, often for a much smaller financial reward, anticipating that upon retirement the state will continue to pay him part of his salary. Inflation affects retired judges the same as it does anyone else; and a judge's reliance upon the state's offer to pay, upon his retirement, a part of the salary allotted to his office surely is one of the significant considerations that induces the judge to remain in office during the required period of time and until the age permitting retirement. Frequently, his retirement compensation is the only resource he has to rely upon when he has reached an age where it is too late to actively engage in any other financial activity.

*Sylvestre*, 214 N.W.2d at 666.

■ In the case before us, the prior retirement statutes stated unequivocally that judicial retirement pay was "additional compensation for services rendered and to be rendered." RSA 490:2 (repealed 2003); RSA 491:2 (repealed 2003); RSA 502-A:6-a (repealed 2003). For the reasons set forth above, we agree with the weight of authority that these statutes created an implied-in-fact contract between the State and the judges who entered into employment when the statutes were in effect, which vested when they were appointed to be judges subject to attaining the age and service requirements. Because we hold that there is a contractual relationship between the State and the petitioners, we address whether RSA chapter 100-C impairs that contractual relationship and, if so, whether the impairment is substantial.

■ The trial court found that because the prior retirement statutes allowed for the calculation of retirement benefits based upon the most recent adjustments in judicial salaries, and because the new statute bases benefits on the amount the judge was being paid at the time of retirement, the new statute "is clearly an impairment of the plaintiffs' vested rights

under the previous statutory benefit." We agree with the trial court that RSA chapter 100-C impairs the obligations entered into under the prior retirement statutes. The petitioners had the right to expect that upon retirement their pension would reflect subsequent increases in pay granted to those in active service.

The trial court also found that the impairment is substantial. In doing so, the court relied upon *Tuttle* and *Opinion of the Justices (Furlough)*. We disagree that these cases compel the conclusion reached by the trial court. The court quoted language in *Tuttle* which states that " '[w]here the right abridged was one that induced the parties to contract in the first place, a court can assume the impairment to be substantial.' " *Tuttle*, 159 N.H. at 649 (quoting *Fraternal Order of Police Lodge No. 89 v. Prince George's County, Md.*, 645 F. Supp. 2d 492, 510 (D. Md. 2009)). We hesitate, however, to adopt this language as the basis for finding substantial impairment in this case. Because the parties' reliance was not at issue in *Tuttle*, the quoted language is dicta. *See Tuttle*, 159 N.H. at 650. In addition, the opinion from which the *Tuttle* court quoted was subsequently reversed. *See Fraternal Order of Police Lodge No. 89 v. Prince George's County, Md.*, 608 F.3d 183 (4th Cir. 2010).

The trial court also relied upon *Opinion of the Justices (Furlough)*, 135 N.H. at 634, and, quoting *Furlough*, concluded that because the impairment affects the "very heart of an employment contract: the promise of certain work for certain income," RSA chapter 100-C is a substantial impairment of the contract between the petitioners and the State. In *Opinion of the Justices (Furlough)*, the terms of a collective bargaining agreement between the State and certain public employees established the basic workweek as thirty-seven and one-half hours per week. *Furlough*, 135 N.H. at 631. Proposed legislation would have required employees to take a certain number of unpaid days of leave. *Id.* at 628. In concluding that the legislation would constitute a substantial impairment of the contract between the State and the employees, we noted that "[t]he affected employees have surely relied on full paychecks to pay for such essentials as food and housing. Many have undoubtedly committed themselves to personal long-term obligations such as mortgages, credit cards, car payments, and the like." *Id.* at 634 (quotation omitted). It was in this context that we concluded: "The bill under consideration here impairs the very heart of an employment contract: the promise of certain work for certain income. Its impact would likely wreak havoc on the finances of many of the affected workers and can only be considered substantial." *Id.* In contrast, unlike an employment contract that guarantees definite hours of work for a definite amount of compensation, there is no absolute certainty from year to year whether any upward modifications to judicial salaries will be

legislatively authorized. In fact, the parties have stipulated that in eight of the years between 1991 and 2010, there was no increase in judicial salaries.

■ In determining the issue of substantial impairment, we look again to the cases favorably cited in *Jeannont*. In *Kern*, the court addressed the issue of modifications by the government in a pension system prior to the time for commencement of payments and concluded that "an employee may acquire a vested contractual right to a pension but . . . this right is not rigidly fixed by the specific terms of the legislation in effect during any particular period in which he serves." *Kern*, 179 P.2d at 803. The court reasoned that "[t]he statutory language is subject to the implied qualification that the governing body may make modifications and changes in the system. The employee does not have a right to any fixed or definite benefits, but only to a substantial or reasonable pension." *Id.* Therefore, the court found no inconsistency in holding that the employee "has a vested right to a pension but that the amount, terms and conditions of the benefits may be altered." *Id.*; *see also Betts v. Bd. of Admin. of Pub. Emp. Ret. System*, 582 P.2d 614, 617 (Cal. 1978) (alterations of employees' pension rights must bear some material relation to the theory of a pension system and its successful operation, and changes in a pension plan which result in disadvantage to the employees should be accompanied by comparable new advantages).

■ In *Bakenhus*, the court held that "the employee who accepts a job to which a pension plan is applicable contracts for a substantial pension and is entitled to receive the same when he has fulfilled the prescribed conditions." *Bakenhus*, 296 P.2d at 540. The court reasoned that the employee's pension rights "may be modified prior to retirement, but only for the purpose of keeping the pension system flexible and maintaining its integrity." *Id.* According to the court, "[t]his view, while it may not be flawless in a purely legalistic sense, gives effect to the reasonable expectations of the employee and at the same time allows the legislature the freedom necessary to improve the pension system and adapt it to changing economic conditions." *Id.*

■ Several other jurisdictions approve the view that, prior to retirement, a plan may be changed only if there is a corresponding change of a beneficial nature to the employee. *See, e.g., Police Pension and Relief Board of Denver v. Bills*, 366 P.2d 581, 584 (Colo. 1961) (prior to eligibility to retire, there is limited vesting of pension rights such that although the plan could be changed, it could not be abolished nor could there be a substantial change of an adverse nature without a corresponding change of a beneficial nature); *In re Marriage of Alarcon*, 196 Cal. Rptr. 887, 892 (Ct.

App. 1983) (while vested rights to pension benefits may be modified before a retirement to keep a pension system flexible and permit adjustments to accord with changing conditions, such modifications must be reasonable and not destroy or impair a vested contractual right to a pension); *Gainer*, 279 S.E.2d at 644 (changes in the pension plan may be allowed if any disadvantages are counter-balanced by advantages, *i.e.*, substitute consideration); *Sylvestre*, 214 N.W.2d at 666 (taking away the right to receive compensation without any compensating benefits constitutes an impairment of contract). Because we reject the approach adopted by the trial court, we reverse and remand this issue for the court to determine in the first instance whether the contractual impairment is offset by any compensating benefits under RSA chapter 100-C.

The petitioners argue in their cross-appeal that the trial court incorrectly excluded the ten percent and one percent salary increases authorized in 2003 and 2005 in calculating their benefits under the prior retirement statutes. Laws 2003, 311:3 amended RSA 491-A:1 to increase the salary of each judicial position by ten percent. This increase became effective on January 1, 2005, the effective date of RSA chapter 100-C. The ten percent increase matched the contribution of ten percent of earnable compensation that judges are required to make to the new plan. *See* RSA 100-C:14. This salary increase was expressly intended not to apply to judges who had already retired and were receiving benefits under the prior retirement statutes. *See* Laws 2003, 311:6. Because the judges' contribution to the new plan was also based upon the ten percent increase, in 2005 judicial salaries were increased by one percent to correct for that effect. *See* Laws 2005, 177:96. The board determined that because the 2005 pay raise was a technical correction of the 2003 raise, it also had to exclude the one percent increase from the calculation of retirement benefits under the prior retirement statutes.

The petitioners argue that these increases should be included in the base calculation of retirement benefits payable under the prior statutes because: (1) the prior retirement statutes calculate benefits as seventy-five percent of the "currently effective salary" for sitting judges; (2) Laws 2003, chapter 311 did not purport to exclude the salary increase from the calculation of the petitioners' benefits payable under the prior plan; and (3) excluding the ten percent raise violates Part I, Article 23 of the State Constitution. The board argues that chapter 311 "clearly and unambiguously" provides that the ten percent increase is not included in determining retirement benefits pursuant to the prior retirement statutes and that the salary increase was a one-time adjustment to judicial salaries equal to contributions required by the new plan. The board further argues that the ten percent increase was not "salary" under the prior retirement statutes because its only

purpose was to compensate for the ten percent employee contribution the judges had to make upon the effective date of the new plan.

 We are persuaded by the board's position that these salary adjustments were authorized for the limited purpose of compensating judges for their ten percent earnable compensation contribution required under the new retirement plan. Therefore, these adjustments may not be characterized as "effective annual salary" for purposes of calculating benefits under the prior retirement statutes. Accordingly, we affirm the trial court on this issue.

*Affirmed in part; reversed in part; and remanded.*

FITZGERALD, J., retired superior court justice, and CARROLL, J., circuit court justice, specially assigned under RSA 490:3, concurred; MANIAS and BEAN, JJ., retired superior court justices, specially assigned under RSA 490:3, concurred in part and dissented in part.

MANIAS, J., retired superior court justice, specially assigned under RSA 490:3, concurring in part and dissenting in part. I agree with the majority that the prior retirement statutes created a contract between the State and the petitioners and that RSA chapter 100-C impairs that contract. I also agree that the salary adjustments provided for by Laws 2003, 311:3 and Laws 2005, 177:96 should not be included in calculating benefits under the prior retirement statutes. However, I disagree that the case should be remanded for further findings by the trial court as to whether the impairment of the petitioners' contract rights is offset by any compensating benefits under the new law. For the reasons that follow, I would affirm the trial court's finding of substantial impairment. I would also affirm the trial court's finding that the new statute is not reasonable and necessary to serve an important public purpose, an issue which the majority does not reach.

The prior retirement statutes tied the petitioners' retirement benefits directly to salaries of sitting judges; namely, "3/4 of the currently effective annual salary of the office from which [the judge] is retired . . . ." RSA 490:2, II (1997) (repealed 2003); RSA 491:2, II (1997) (repealed 2003); RSA 502-A:6-a, III (1997) (repealed 2003). RSA chapter 100-C cuts that link and instead fixes the petitioners' retirement benefits at "75 percent of the member's final year's salary," RSA 100-C:5, II, subject to discretionary increases by the Board of Trustees of the New Hampshire Judicial Retirement Plan (board), RSA 100-C:13, III(g); RSA 100-C:17. As demonstrated by the variety of projected payout calculations in the parties' joint stipulation, it is not possible precisely to quantify the difference between the financial benefits to be expected under the new and old retirement

statutory schemes. However, it cannot be denied that the new system allows for the possibility that the benefits paid to retired judges will not keep pace with the salaries of sitting judges. That possibility did not exist under the prior laws. Thus I agree that RSA chapter 100-C impairs the State's obligations entered into under the prior retirement statutes.

In seeking to distinguish this case from *Opinion of the Justices (Furlough)*, 135 N.H. 625 (1992), the majority notes that the old system did not guarantee any specific increases to the retired judges (just as the new system does not), and that, in eight of the years between 1991 and 2010, there was no increase in judicial salaries. In my opinion, this misses the point. Under the old system, the petitioners could count on automatic increases whenever sitting judges received them. Under the new system, that is no longer true. No longer can they trust in the fact that the legislature will inevitably, albeit not at regular intervals, increase the salaries of sitting judges as dictated by the need to attract qualified persons to the bench. Instead, they must rely solely on the discretion of the board, which is subject to additional statutory preconditions described in the majority opinion. As the petitioners put it, "retired judges' COLA's are, under the prior system, a function of the employment market because the retired judges remain in 75% parity with sitting judges' salaries. COLAs under RSA chapter 100-C, on the other hand, are simply a function of the Board's discretion, driven largely, if not entirely, by the Plan's recent and forecast investment returns." The trial court acknowledged this difference between the two plans, finding that the new law "prohibits retired judges from receiving the advantages of any raises or COLAs instituted for the benefit of the judges presently sitting after their retirement."

Thus, while I agree with the majority that the contract right impaired in this case does not have the degree of definiteness as the right at issue in *Opinion of the Justices (Furlough)*, 135 N.H. at 634, I still think it clear that RSA chapter 100-C's provision for discretionary increases is neither fair nor equivalent compensation for the impairment of the petitioners' contract rights under the former plan. *See Sylvestre v. State*, 214 N.W.2d 658, 666 (Minn. 1973) ("Surely, if there is a contract, taking away the right to receive compensation based on the increased salary of judges without any compensating benefits constitutes an impairment of the contract."); *Wagoner v. Gainer*, 279 S.E.2d 636, 644 (W. Va. 1981) ("other courts, in what we consider the better view, will allow a change in the plan if any disadvantages are counter-balanced by advantages, *i.e.*, substitute consideration").

In *Tuttle v. New Hampshire Medical Malpractice Joint Underwriting Association*, 159 N.H. 627 (2010), this court recognized that "the determination of whether a contract impairment is substantial may be influenced

by whether the contracting parties relied on the abridged contract right. Where the right abridged was one that induced the parties to contract in the first place, a court can assume the impairment to be substantial." *Tuttle*, 159 N.H. at 649 (quotation omitted). In explaining its conclusion that the impairment to the contract was substantial, the trial court cited the foregoing passage. In the instant case, as in *Tuttle*, there is no dispute as to the meaning of the statutory provisions underlying the petitioners' Contract Clause claim. Also as in *Tuttle*, the State did not contest the petitioners' reliance upon the alleged contractual right at issue. Rather, the State argued at length that the statute did not create a contract and, in the alternative, that any contract that was created was not substantially impaired.

I agree with the trial court that the right to a retirement benefit tethered to the salary of currently sitting judges was an inducement upon which the petitioners reasonably relied in accepting the offer of appointment to the office. This conclusion is supported by the language of the statutes in effect when the petitioners accepted employment. Those statutes provided that the retirement benefit was "additional compensation for services rendered *and to be rendered.*" RSA 502-A:6-a, III (1997) (repealed 2003) (emphasis added); RSA 490:2, II (1997) (repealed 2003) (emphasis added); RSA 491:2, II (1997) (repealed 2003) (emphasis added). Retired judges continue to serve as judges and referees after they retire. RSA 490:3, II (2010); RSA 493-A:1, II (2010); RSA 493-A:1-a, I (2010); RSA 502-A:6-b (2010). That they have done so and continue to do so as a matter of practice is not subject to legitimate dispute. This distinguishes them from other public retirees and adds force to the argument that, in accepting appointment as judges, they were induced by and relied upon the statutory promise of retirement benefits specifically pegged to the salaries of sitting justices.

Under these circumstances, I would hold that RSA chapter 100-C, by cutting the link between the petitioners' retirement benefits and the salaries of sitting justices and subjecting them to the discretion of the board without regard to the current salaries of sitting justices, substantially impairs the contract established by the retirement statutes in effect when the petitioners took office.

The majority opinion questions the trial court's use of the inducement-and-reliance passage from *Tuttle* on two grounds, neither of which I find persuasive. As I read its opinion, the *Tuttle* majority did not conclude that reliance itself was irrelevant to its conclusion; rather, it deemed that reliance was established for purposes of the appeal. *Tuttle*, 159 N.H. at 649-50. Even though the *Tuttle* majority did not provide an analytical framework for deciding whether particular facts amount to reliance, its

statement of the presumptive significance of reliance clearly contributed to its resolution of the issue of substantial impairment and thus is not mere dicta, as the majority maintains.

The majority also questions the soundness of *Tuttle's* reliance-and-inducement rule, given that the language was taken from a district court opinion which was subsequently reversed by the Fourth Circuit. *Fraternal Order of Police Lodge No. 89 v. Prince George's County, Md.*, 645 F. Supp. 2d 492 (D. Md. 2009), *rev'd*, 608 F.3d 183 (4th Cir. 2010). However, the appellate court did not disagree with or even comment upon the district court's substantial impairment analysis; it reversed because it found no contract impairment in the first place. *Fraternal Order*, 608 F.3d at 190-91. Moreover, the *Fraternal Order* district court opinion is not the sole authority supporting the importance of inducement and reliance in the context of a substantiality analysis. *See, e.g., Houlton Citizens' Coalition v. Town of Houlton*, 175 F.3d 178, 190 (1st Cir. 1999) ("In order to weigh the substantiality of a contractual impairment, courts look long and hard at the reasonable expectations of the parties."); *Sal Tinnerello & Sons, Inc. v. Town of Stonington*, 141 F.3d 46, 53 (2d Cir.), *cert. denied*, 525 U.S. 923 (1998) ("[T]he primary consideration in determining whether the impairment is substantial is the extent to which reasonable expectations under the contract have been disrupted."). Both of these cases are cited in *Tuttle*. *Tuttle*, 159 N.H. at 669 (Dalianis and Duggan, JJ., dissenting). Although the dissent disagreed with the majority's view that actual reliance was not at issue, it clearly shared the majority's view that reliance was a primary consideration in determining whether a contract impairment was substantial.

Because I agree with the trial court's finding of substantial impairment, I must also address the question whether the impairment of the petitioners' contract rights was reasonable and necessary to serve an important public purpose.

"If the legislation substantially impairs the contract, a balancing of the police power and the rights protected by the contract clause[] must be performed, and the law may pass constitutional muster only if it is reasonable and necessary to serve an important public purpose." *Tuttle*, 159 N.H. at 641 (quotations, ellipses, and brackets omitted).

> We generally defer to the judgment of the legislature in determining whether a particular act is reasonable and necessary to serve an important public purpose, but when the State attempts to abrogate its own contractual responsibilities, complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake. Application of stricter judicial review reflects the principle that those who

lawfully contract amongst themselves must have reasonable assurances that their rights and obligations will not be disturbed.

*Lower Village Hydroelectric Assocs. v. City of Claremont*, 147 N.H. 73, 78 (2001) (citations and quotations omitted). In this case, where the State was a party to the contract that is substantially impaired by RSA chapter 100-C, complete deference is not appropriate.

I agree with the trial court that the State's justification for the contract impairment here was insufficient. The State argued that the changes at issue provided a long term fiscal solution to eradicate the unfunded liability created by the previous retirement statutes and that the changes also allowed an opportunity for benefits upon early retirement, which was not available previously. While the proffered justification may be reasonable going forward, there was no showing that it was reasonable and necessary for the legislature to apply these changes retroactively to the determinate class of judges who had accepted their appointments and served in reliance upon the provisions of the prior retirement system. *See Miles v. Tenn. Consol. Retirement System*, 548 S.W.2d 299, 305 (Tenn. 1976) (legislature did not have power to modify pension benefits "in the absence of a showing that a vital interest of the State must be protected by an exercise of the police power").

Accordingly, I respectfully dissent from the majority's decision to remand the case for further findings regarding substantiality of impairment. I would affirm the decision below.

BEAN, J., retired superior court justice, specially assigned under RSA 490:3, joins in the opinion of MANIAS, J.