2012 COA 169

Gary R. JUSTUS; Kathleen Hopkins; Eugene Halaas; and Robert P. Laird, Jr., Plaintiffs–Appellants,

v.

The STATE of Colorado; Governor John Hickenlooper, in his official capacity; Colorado Public Employees' Retirement Association; Carole Wright, in her official capacity; and Maryann Motza, in her official capacity, Defendants–Appellees.

No. 11CA1507.

Colorado Court of Appeals, Div. IV.

Oct. 11, 2012.

Richard Rosenblatt & Associates, LLC, Richard Rosenblatt, Greenwood Village, Colorado; Stember, Feinstein, Doyle & Payne, LLC, John Stember, William T. Payne, Stephen M. Pincus, Philadelphia, Pennsylvania, for Plaintiffs–Appellants.

John W. Suthers, Attorney General, Maurice G. Knaizer, First Assistant Attorney General, William V. Allen, Senior Assistant Attorney General, Megan Paris Rundlet, Assistant Attorney General, Denver, Colorado, for Defendants–Appellees The State of Colorado and Governor John Hickenlooper.

Reilly Pozner LLP, Daniel M. Reilly, Sean Connelly, Eric Fisher, Lindsay A. Unruh, Caleb Durling, Denver, Colorado, for Defendants–Appellees Colorado Public Employees' Retirement Association, Carole Wright, and Maryann Motza.

Opinion by Judge J. JONES.

¶ 1 Plaintiffs, Gary R. Justus, Kathleen Hopkins, Eugene Halaas, and Robert P. Laird, Jr., are recipients of retirement benefits through the Colorado Public Employees' Retirement Association (PERA). They challenge sections 19 and 20 of Senate Bill 10–001 (now codified at §§ 24–51–1001, 24–51–1002, C.R.S.2012), which reduced the amount they were entitled to receive as a cost-of-living adjustment (COLA) to their PERA benefits. Specifically, they claim that this reduction violates their rights under the Contract Clauses of the United States and Colorado Constitutions and the Takings Clause of the United States Constitution.

¶ 2 The district court granted summary judgment in favor of defendants, the State of Colorado, Governor John Hickenlooper, PERA, Carole Wright (Chair of the PERA Board of Trustees), and Maryann Motza (Vice–Chair of the PERA Board of Trustees). It ruled that plaintiffs have no contractual right to the COLA in effect when they retired, and that absent such a contractual right, plaintiffs' claims necessarily fail.

¶ 3 On appeal, plaintiffs contend that, under the holdings of *Police Pension & Relief Bd. v. McPhail*, 139 Colo. 330, 338 P.2d 694 (1959), and *Police Pension & Relief Bd. v. Bills*, 148 Colo. 383, 366 P.2d 581 (1961), they have a contractual right to the COLA in effect when they became eligible to retire or retired, which could not be reduced. We agree with plaintiffs, subject to certain limitations explained below. Specifically, we conclude that plaintiffs have a contractual right, but that the court must still determine whether any impairment of the right is substantial and, if so, whether the reduction was reasonable and necessary to serve a significant and legitimate public purpose. Therefore, we reverse the summary judgment and remand the case to the district court for further proceedings.

## I. Factual and Statutory Background

¶ 4 PERA provides retirement benefits to government employees. PERA has five divisions: state, school, local government, judicial, and Denver Public Schools (DPS). § 24–51–201(2), C.R.S.2012. It is funded by contributions from participating governmental employees and their employers. *See* § 24–51–401(1.7), C.R.S.2012. A retired PERA member is entitled to a monthly retirement benefit, the amount of which is determined by statute. § 24–51–603, C.R.S.2012.

¶ 5 Ms. Hopkins and Mr. Laird are former employees of the State of Colorado who retired in 2001 and 2010, respectively. Mr. Halaas (a former judge) is a former public official of the State of Colorado who retired in 1999. All three receive retirement benefits through PERA.

¶ 6 Mr. Justus is a former employee of DPS who retired in 2003. Before 2010, he received his pension through the Denver Public Schools Retirement System (DPSRS). In 2010, the General Assembly merged DPSRS into PERA. *See generally* Ch. 288, sec. 1–56, §§ 24–51–101 to –1715, 2009 Colo. Sess. Laws 1331–69. He now receives his retirement benefits through PERA.

¶ 7 Because some history of PERA and the changes to the COLA under PERA and DPSRS is relevant to resolving the issue raised by plaintiffs on appeal, we detail the relevant history below.

### A. PERA's COLA Before the Enactment of Senate Bill 10-001

¶8 The General Assembly created a pension system for state employee retirees in 1931. *See* Ch. 157, §§ 111-1-1 et seq., 1931 Colo. Sess. Laws 742-52. At the same time, the General Assembly provided expressly that the retirement board created to administer the system could not reduce the benefits (termed "annuities") paid to retirees. Ch. 157, § 111-1-22, 1931 Colo. Sess. Laws 752. But the General Assembly did not include any provision for a COLA.

¶9 In 1935, the General Assembly authorized the retirement board to increase member contributions to the pension fund or to decrease pension benefits payable to retirees, Ch. 203, sec. 7, § 111-1-22, 1935 Colo. Sess. Laws 1055.

¶10 In 1969, the General Assembly repealed the provision authorizing the board to decrease pension payments. Ch. 252, sec. 7, § 111-1-22, 1969 Colo. Sess. Laws 888. And it enacted two provisions authorizing two types of COLAs for PERA members.[1] One provision included a table specifying the percentage increase then-current PERA retirees were entitled to receive in their monthly retirement benefits based on the year each had retired (the base COLA). The earlier the member had retired, the greater the increase to the member's initial benefit. Ch. 256, sec. 1, § 111-1-35, 1969 Colo. Sess. Laws 904; Ch. 260, sec. 1, § 111-2-23, 1969 Colo. Sess. Laws 917.[2] The other provision increased retired members' benefits each year, on a noncompounded basis, by the lesser of one and one-half percent or the increase in the consumer price index (CPI) in the past year, as determined by a fractional formula (the supplemental COLA). Ch. 111, § 111-1-35(2)(b), (3)(c), (5)(b), (6)(c), 1969 Colo. Sess. Laws 897; Ch. 257, sec. 8, § 111-2-23, 1969 Colo. Sess. Laws 909-10.[3]

¶11 In 1973, the General Assembly changed the supplemental COLA to the lesser of three percent or the CPI increase. Ch. 320, sec. 8, § 111-2-27(2)(b), (5)(b), 1973 Colo. Sess. Laws 1117; *see also* Ch. 194, sec. 8, §§ 24-51-1002 to -1003, 1987 Colo. Sess. Laws 1071. It also authorized a supplemental COLA for judicial division members that was the lesser of one and one-half percent or the CPI increase. Ch. 323, sec. 6, § 111-6-14, 1973 Colo. Sess. Laws 1130.

¶12 Between 1975 and 1987, the General Assembly increased the base COLA percentages on several occasions. *E.g.*, Ch. 194, sec. 8, §§ 24-51-1005 to -1006, 1987 Colo. Sess. Laws 1072-73 (creating a cost of living stabilization fund "for the purpose of paying for increases in the initial benefits"); Ch. 185, sec. 1, § 24-51-136(1), 1986 Colo. Sess. Laws 955-56; Ch. 195, sec. 1, § 24-51-136(1), 1984 Colo. Sess. Laws 715-16; Ch. 102, sec. 1, § 24-51-136(1), 1982 Colo. Sess. Laws 390-91; Ch. 118, sec. 3, § 24-51-136(1)-(2), 1980 Colo. Sess. Laws 604-05; Ch. 335, sec. 1, § 24-51-224, 1977 Colo. Sess. Laws 1234-35; Ch. 222, sec. 1, § 24-51-136, 1975 Colo. Sess. Laws 839.

¶13 In 1987, the General Assembly repealed and reenacted the PERA statutes, with substantial amendments. As relevant here, it changed the supplemental COLA to the lesser of three percent times the number of years the benefit had been paid (one and one-half percent for judicial division members), or the percentage increase in the CPI between the year before payment of the initial benefit and the current year. Ch. 194, sec. 8, § 24-51-1002(1), (2), 1987 Colo. Sess. Laws 1071. The latter option—a so-called "banking" provision—allowed PERA retirees to take advantage of years in which the CPI increase had been more than three percent by adding the CPI for those years to the

---

1. These provisions excluded judges. Judges' pension benefits were instead governed by article 6 of PERA. *See* Ch. 194, sec. 1, § 111-6-1, 1959 Colo. Sess. Laws 625.

2. The General Assembly first authorized judicial division employees to receive the base COLA in 1977. Ch. 335, sec. 1, § 24-51-224(1), 1977 Colo. Sess. Laws 1234.

3. Neither provision referred expressly to "cost of living." The base COLA provision was entitled "Increase in public employees' benefits," and the supplemental COLA provision was entitled "Redetermination of benefits." Ch. 256, sec. 1, § 111-1-35, 1969 Colo. Sess. Laws 904; Ch. 111, § 111-1-35(2)(b), (3)(c), (5)(b), (6)(c), 1969 Colo. Sess. Laws 896. In substance, however, they were COLA provisions.

years in which it had been less (thereby "banking" the above-three percent increases), but only so long as the total percentage increase averaged less than three percent per year.

¶ 14 The General Assembly also enacted a new provision in 1987 which stated:

Cost of living increases in retirement benefits and survivor benefits shall be made only upon approval by the general assembly. Such increases in benefits shall be calculated in accordance with the provisions of sections 24–51–1006 [the base COLA] to 24–51–1008 and shall be paid from the cost of living stabilization fund.

Ch. 194, sec. 1, § 24–1–1001(2), 1987 Colo. Sess. Laws 1071.

¶ 15 In 1988 and 1992, respectively, the General Assembly increased the supplemental COLA available to judicial members [4] and non judicial members.[5] During this period, it continued to increase the base COLA. *See* Ch. 175, sec. 10, § 24–51–1006, 1992 Colo. Sess. Laws 1137–38; Ch. 182, sec. 1, § 24–51–1006, 1990 Colo. Sess. Laws 1254–55; Ch. 187, sec. 1, § 24–51–1006, 1988 Colo. Sess. Laws 973–74.

¶ 16 In 1993, the General Assembly eliminated the base COLA and amended the supplemental COLA for all PERA members. It fixed the supplemental COLA at the lesser of

three and one-half percent, compounded annually, times the number of years a member's benefit had been payable after 1993, or the percent increase in the CPI from the latter of 1992 or the year before a member's benefit became payable (thereby resetting the "banking" provision to exclude pre–1992 CPI changes). Ch. 138, secs. 6–7, 13, §§ 24–51–1001, –1002, –1006, 1993 Colo. Sess. Laws 478–80.[6] The General Assembly also repealed subsection 24–51–1001(2), which, as noted, had provided that cost of living increases to retirement benefits could be made only upon approval by the General Assembly. Ch. 138, sec. 6, § 24–51–1001, 1993 Colo. Sess. Laws 478.

¶ 17 In 2000, the General Assembly eliminated the COLA increase alternative tied to the CPI, and set the supplemental COLA for all PERA members at three and one-half percent, compounded annually. Ch. 186, sec. 7, § 24–51–1002, 2000 Colo. Sess. Laws 782. In relevant part, the amended statute stated: "The cumulative increase applied to benefits paid shall be recalculated annually and shall be the total percent derived by multiplying three and one-half percent, compounded annually, times the number of years such benefit has been effective after March 1, 2000." *Id.* That COLA remained in effect until Senate Bill 10–001's enactment.[7]

---

4. *See* Ch. 186, sec. 9, § 24–51–1002(2)(a)–(b), 1988 Colo. Sess. Laws 971 ("The percentage increase applied to benefits paid from the judicial division ... shall be the lesser" of the percent increase in the CPI and "[t]he total percent derived by multiplying one and one-half percent times the number of full years the benefit has been paid as of May 1, 1988, and by multiplying three percent times the number of full years the benefit has been paid after May 1, 1988.").

5. Ch. 175, sec. 7, § 24–51–1002(1), 1992 Colo. Sess. Laws 1136 (The percentage increase for state employees is the lesser of the "[t]he total percent derived by adding the product of three percent times the number of full years such benefit has been effective as of May 1, 1992, plus the product of four percent times the number of full years such benefit has been effective after May 1, 1992," and the percent increase in the CPI). The 1992 amendment also increased the non-CPI option for judicial employees to "[t]he total percent derived by adding the product of one and one-half percent times the number of full years such benefit has been effective as of May 1, 1988, plus the product of three percent times the number of full years such benefit has been effective after

May 1, 1988, as of May 1, 1992, plus the product of four percent times the number of full years such benefit has been effective after May 1, 1992."). Ch. 175, sec. 7, § 24–51–1002(2), 1992 Colo. Sess. Laws 1136.

6. Plaintiffs contend that the General Assembly also made the supplemental COLA increases automatic—that is, not subject to the General Assembly's approval each year. But the supplemental COLA was automatic before 1993; it was the base COLA (eliminated by the 1993 revisions) that required the General Assembly's annual approval. *See* Ch. 138, sec. 6, § 24–51–1001(1)–(2), 1993 Colo. Sess. Laws 478((1) retaining the language that "[a]nnual increases in retirement benefits" calculated under section 24–51–1002 shall occur, and (2) eliminating the provision requiring approval of "cost of living increases in retirement benefits" calculated in accordance with section 24–51–1006).

7. The General Assembly did, however, adjust the COLA for some PERA members who retired after plaintiffs. *See, e.g.,* Ch. 308, secs. 40–41, § 24–51–1002(1)(a.5), 2006 Colo. Sess. Laws 1502;

### B. DPSRS's COLA Formula Before the Enactment of Senate Bill 10–001

¶ 18 As with COLA benefits under PERA, the DPSRS COLA formula changed several times over the past few decades. Between 1965 and 1973, DPS retirees received a COLA of one percent per year, noncompounding.[8] The DPS retirement board increased that amount, as relevant here, to two percent in 1974, three percent in 1981, three and one-quarter percent in 1986, and three and one-quarter percent, compounded annually, in 2001.[9]

### C. Senate Bill 10–001

¶ 19 In 2009, because of a significant decrease in PERA's funding level, the General Assembly directed the PERA board to "submit specific, comprehensive recommendations to the general assembly regarding possible methods to respond to the decrease in the value of [PERA]'s assets . . . to ensure that [PERA] will become and remain fully funded." § 24–51–211(2), C.R.S.2012. In response to the board's recommendations, the General Assembly enacted Senate Bill 10–001 to make "modifications to [PERA] necessary to reach a one hundred percent funded ratio within the next thirty years." Ch. 2, 2010 Colo. Sess. Laws 4. The portion of the bill changing the COLA is now codified at section 24–51–1002.

¶ 20 Section 24–51–1002 sets forth separate formulas for calculating the 2010 COLA and the COLA for years after 2010.

¶ 21 The COLA awarded to retired PERA members in 2010 was the lesser of two percent or the average of the national CPI in 2009 for urban wage earners and clerical workers. § 24–51–1002(1). Because the

change in the relevant CPI was negative in 2009, PERA retirees received no COLA in 2010.

¶ 22 The formula for the post–2010 COLA is the same as that for the 2010 COLA, except that if and when PERA's funded ratio reaches one hundred and three percent, the COLA automatically will increase by one-quarter of one percent per year, compounded annually. §§ 24–51–1002(2), –1009.5, C.R.S. 2012. If the ratio falls below ninety percent, the COLA automatically will be decreased by one-quarter of one percent annually, but will never fall below two percent. § 24–51–1009.5.

## II. Procedural History

¶ 23 Shortly after the Governor signed Senate Bill 10–001 into law, plaintiffs filed suit against defendants,[10] claiming, as relevant here, that those sections of Senate Bill 10–001 reducing their COLA violate their rights under the Contract Clauses of the United States and Colorado Constitutions. They later amended their complaint to assert violations of the Takings and Due Process Clauses of the United States Constitution. They also asked the district court to certify a class comprised of PERA members currently receiving pension benefits who had retired during specified periods, and their survivors.[11]

¶ 24 Relying largely on the supreme court's decisions in *McPhail* and *Bills*, plaintiffs moved for partial summary judgment on their Contract Clause claim under the Colorado Constitution. PERA, Ms. Wright, and Ms. Motza (the PERA defendants) then moved for summary judgment on all of plaintiffs' claims. They argued that *McPhail* and

---

Ch. 214, sec. 9, § 24–51–1002(1)(a.5), 2004 Colo. Sess. Laws 700.

**8.** DPSRS called the COLA an "Annual Retirement Allowance Adjustment."

**9.** DPSRS also provided a base COLA to certain DPS retirees. Mr. Justus, however, was not eligible to receive a base COLA.

**10.** Initially, the named defendants included then Governor Bill Ritter, and then Chair and Vice Chair of the PERA Board of Trustees, Mark J. Anderson and Sara J. Valt. Plaintiffs later substi-

tuted Governor Hickenlooper, Ms. Wright, and Ms. Motza for those defendants.

**11.** Specifically, the proposed class included "[a]ll PERA members who received or may receive pension benefits from PERA on or after March 1, 2010, and (1) who are not in the DPS Division and became eligible to retire or retired between March 1, 1994, and February 28, 2010, inclusive; or (2) who are in the DPS Division and became eligible to retire or retired between January 1, 1974, and February 28, 2010, inclusive," as well as certain qualified survivors of the aforementioned members.

*Bills* are not controlling because those cases did not address circumstances of financial necessity, and preceded the supreme court's adoption of a new test for state and federal Contract Clause claims in *In re Estate of DeWitt,* 54 P.3d 849 (Colo.2002). Tracking the *DeWitt* test, the PERA defendants argued that plaintiffs were unable to establish that: (1) they had a contractual right to an unchangeable COLA; (2) the change to the COLA was inconsistent with their reasonable expectations and thus substantially impaired any such right, given the numerous pre–2010 changes to the COLA under PERA and DPSRS; and (3) the change was unreasonable or unnecessary to serve a legitimate public purpose. Because plaintiffs' Takings and Due Process Clause claims are premised on plaintiffs having a contractual right to a specific COLA, the PERA defendants argued that those claims also must fail.

¶ 25 The district court denied plaintiffs' motion. Soon thereafter, it granted the PERA defendants' motion, concluding that "[w]hile Plaintiffs unarguably have a contractual right to their PERA pension itself, they do not have a contractual right to the specific COLA formula in place at their respective retirement, for life without change." Addressing the first part of the *DeWitt* test, the court reasoned that the language of PERA's and DPSRS's pre–2010 COLA provisions did not suggest that a particular COLA formula would remain unchanged for life. Rather, because of the repeated changes to the COLA under both PERA and DPSRS, the court concluded that plaintiffs had no reasonable expectation to an unchanged lifelong COLA and, therefore, could not establish that they had a contractual right to a particular COLA. (The court did not consider the other parts of the *DeWitt* Contract Clause test.) The court also concluded that because plaintiffs do not have a contractual right, they have no property right in a particular COLA, and therefore their Takings and Due Process claims also fail.[12]

## III. Discussion

¶ 26 On appeal, plaintiffs contend that the district court erred by granting summary judgment on their Contract and Takings Clause claims[13] because, under *McPhail* and *Bills,* once they became eligible to retire or retired, they each acquired a contractual right to the COLA then in effect that precluded the General Assembly from making any adverse change to the formula. We agree with plaintiffs to some extent. They have a contractual right to have their retirement benefits calculated using the COLA in effect when their rights vested, before the effective date of Senate Bill 10–001. But we disagree with plaintiffs that this conclusion entitles them to judgment in their favor. As discussed below, sections 19 and 20 of Senate Bill 10–001 do not violate plaintiffs' rights under the Contract Clauses if: (1) their contract right has not been impaired; (2) any impairment is not substantial; or (3) the change in the COLA was reasonable and necessary to serve a significant and legitimate public purpose. The district court has not yet ruled on those issues, and we decline the parties' invitations to rule on those issues in this appeal.

### A. Standard of Review

¶ 27 We review a grant of summary judgment de novo. *Shelter Mut. Ins. Co. v. Mid-Century Ins. Co.,* 246 P.3d 651, 657 (Colo.2011). Summary judgment is proper only when the pleadings and supporting documentation establish that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. *Id.*

### B. Contract Clause Claims

¶ 28 The Contract Clauses of the United States and Colorado Constitutions prohibit the General Assembly from passing a law that impairs contract obligations. U.S.

---

12. The court did not consider whether to certify the proposed class. Class discovery ended one day before the court granted the PERA defendants' summary judgment motion. Therefore, the parties never had the opportunity to brief the class certification issue.

13. Plaintiffs do not contend that the court erred by granting summary judgment on their due process claim. Therefore, they have abandoned that claim on appeal, and we do not consider it. *See Freedom from Religion Found., Inc. v. Hickenlooper,* 2012 COA 81, ¶ 31, —— P.3d ——.

Const. art. I, § 10 ("No state shall ... pass any ... law impairing the obligation of contracts...."); Colo. Const. art. II, § 11 ("No ... law impairing the obligation of contracts ... shall be passed by the general assembly."). To decide whether a change in state law violates these Clauses, a court must first consider whether the change " 'operate[s] as a substantial impairment of a contractual relationship.' " *General Motors Corp. v. Romein,* 503 U.S. 181, 186, 112 S.Ct. 1105, 117 L.Ed.2d 328 (1992) (quoting *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 244, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978)); *accord In re Estate of DeWitt,* 54 P.3d at 858. If it does, that does not end the inquiry: the impairment may not necessarily run afoul of the Contract Clauses. The court must next determine whether the state has a significant and legitimate public purpose for the change, "such as the remedying of a broad and general social or economic problem." *Energy Reserves Grp., Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 411–12, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983); *accord Buffalo Teachers Fed'n v. Tobe,* 464 F.3d 362, 368 (2d Cir. 2006); *Troy Ltd. v. Renna,* 727 F.2d 287, 297 (3d Cir.1984); *In re Estate of DeWitt,* 54 P.3d at 858. Finally, if the state does have such a purpose, the court must determine whether the change "is reasonable and necessary to serve [the] important public purpose." *United States Trust Co. v. New Jersey,* 431 U.S. 1, 25, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977); *accord San Diego Police Officers' Ass'n v. San Diego City Employees' Ret. Sys.,* 568 F.3d 725, 737 (9th Cir.2009); *see Energy Reserves Grp.,* 459 U.S. at 412–13, 103 S.Ct. 697; *In re Estate of DeWitt,* 54 P.3d at 858. If so, the impairment does not violate the Contract Clauses.

#### 1. Substantial Impairment of a Contractual Relationship

¶ 29 To determine whether a change in law substantially impairs a contractual relationship, a court must consider whether (1) there is a contractual relationship, (2) the change in law impairs that contractual relationship, and (3) the impairment is substantial. *General Motors Corp.,* 503 U.S. at 186, 112 S.Ct. 1105; *In re Estate of DeWitt,* 54 P.3d at 858. Here, as noted, the district court considered only the first part of this test.

#### a. Existence of a Contractual Relationship

##### i. General Principles

¶ 30 A contractual relationship exists if a statute gives a party a vested contract right. *See In re Estate of DeWitt,* 54 P.3d at 858. "[T]he presumption is that 'a law is not intended to create ... contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise.' " *Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.,* 470 U.S. 451, 466, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985) (quoting in part *Dodge v. Bd. of Educ.,* 302 U.S. 74, 79, 58 S.Ct. 98, 82 L.Ed. 57 (1937)); *accord Colorado Springs Fire Fighters Ass'n, Local 5 v. City of Colorado Springs,* 784 P.2d 766, 773 (Colo.1989).

> Finding a public contractual obligation has considerable effect. It means that a subsequent legislature is not free to significantly impair that obligation for merely rational reasons. Because of this constraint on subsequent legislatures, and thus on subsequent decisions by those who represent the public, there is, for the purposes of the Contract Clause, a higher burden to establish that a contractual obligation has been created.

*Parella v. Ret. Bd. of Rhode Island Employees' Ret. Sys.,* 173 F.3d 46, 60 (1st Cir.1999); *see Nat'l R.R. Passenger Corp.,* 470 U.S. at 466, 105 S.Ct. 1441.

¶ 31 To overcome the presumption, the party claiming the contractual right must show that there is a clear indication that the legislature intended to bind itself contractually. *Nat'l R.R. Passenger Corp.,* 470 U.S. at 465–66, 105 S.Ct. 1441; *Parella,* 173 F.3d at 60. A court ordinarily ascertains whether the legislature so intended by examining whether the language of the statute and the circumstances surrounding its enactment or amendment manifest an intent to create an enforceable contractual right. *United States Trust Co.,* 431 U.S. at 17 n. 14, 97 S.Ct. 1505; *Colorado Springs Fire Fighters Ass'n,* 784 P.2d at 773; *Kilbourn v. Fire & Police Pension Ass'n,* 971 P.2d 284, 287 (Colo.App.

1998); *see Nat'l R.R. Passenger Corp.*, 470 U.S. at 470, 105 S.Ct. 1441. Absent evidence to the contrary, pervasive prior regulation in the area the statute governs suggests that the party had no legitimate expectation that the statute would not change and, hence, no binding contractual right in the prior version of the statute. *See Nat'l R.R. Passenger Corp.*, 470 U.S. at 469, 105 S.Ct. 1441; *Energy Reserves Grp.*, 459 U.S. at 412–13, 416, 103 S.Ct. 697; *In re Estate of DeWitt*, 54 P.3d at 859.

### ii. *McPhail* and *Bills*

¶ 32 Before the United States Supreme Court and the Colorado Supreme Court articulated the current analytical framework for Contract Clause claims, the Colorado Supreme Court decided *McPhail* and *Bills*. Both cases involved the repeal of a city charter provision that entitled retired police pension plan members to a pension increase equal to one-half of any post-retirement pay raises granted to police officers of their ranks at the time of retirement (a so-called "escalation" provision). *McPhail*, 139 Colo. at 333, 338 P.2d at 695–96; *Bills*, 148 Colo. at 385–86, 366 P.2d at 582.

¶ 33 In *McPhail*, the supreme court considered whether the repeal violated the Contract Clause of the Colorado Constitution for pension plan members who had retired before the repeal took effect. The court rejected the defendants' argument that the plaintiffs had no vested right to the benefit created by the escalation provision because that provision was subject to legislative change. 139 Colo. at 336, 338 P.2d at 697.

Instead, it quoted with approval the principle that

> "[u]ntil an employee has earned his retirement pay, or until the time arrives when he may retire, his retirement pay is but an inchoate right; but when the conditions are satisfied, at that time retirement pay becomes a vested right of which the person entitled thereto cannot be deprived; it has ripened into a full contractual obligation."

*Id.* at 342, 338 P.2d at 700 (quoting *Ret. Bd. of Allegheny County v. McGovern*, 316 Pa. 161, 174 A. 400, 404–05 (1934)).

¶ 34 In *Bills*, the supreme court considered, as relevant here, the rights of (1) plan members who had become eligible to retire before the repeal took effect but had not actually retired until after that date, and (2) plan members who had not retired or become eligible to retire before the effective date of the repeal, but who had retired before a pay raise had been given to active police officers. Citing the above-quoted language in *McPhail*, the court held that the repeal violated the contractual rights of the first group. 148 Colo. at 389–90, 366 P.2d at 584. As to the second group, the court held that even if the officers were not eligible to retire at the time of the repeal, they nevertheless had a "limited" vested right in the escalation provision that could not be substantially changed adversely "without a corresponding change of a beneficial nature" or unless "actuarially necessary." *Id.* at 390, 366 P.2d at 584.[14]

■ ¶ 35 We consider *McPhail* and *Bills* dispositive of whether plaintiffs here have a contractual right to a particular COLA.[15] We

---

14. We acknowledge some tension between this holding in *Bills* and the court's statement in *McPhail* that until the conditions for receiving retirement pay have been satisfied, the right to receive such pay is "inchoate." We also acknowledge that, where the legislative body has, over time, made a number of changes to the benefit in question, this holding in *Bills* gives rise to problems in determining the precise vested right. But *Bills* post-dates *McPhail* and, as discussed below, Colorado appellate courts have repeatedly applied the *Bills* "limited" vesting holding.

15. Several cases from other jurisdictions likewise suggest that an employee has a vested contractual right in retirement benefits for Contract Clause purposes once the employee becomes eli-

gible to retire or retires. *See, e.g., Larsen v. Senate of the Commonwealth of Pa.*, 154 F.3d 82, 89 (3d Cir.1998); *Nicholas v. State*, 116 Nev. 40, 992 P.2d 262, 264–65 (2000) (citing *McPhail*); *Cloutier v. State*, 163 N.H. 445, 42 A.3d 816, 822–26 (2012) (citing *Bills*); *Wiggs v. Edgecombe County*, 179 N.C.App. 47, 632 S.E.2d 249, 254 (2006), *aff'd*, 361 N.C. 318, 643 S.E.2d 904 (2007); *Arena v. City of Providence*, 919 A.2d 379, 395 (R.I.2007); *see also Maryland State Teachers Ass'n, Inc. v. Hughes*, 594 F.Supp. 1353, 1358, 1363–64 (D.Md.1984) (an amendment capping COLA increases at three percent was permissible because retirement benefits earned before the amendment's effective date would still be calculated under the former COLA formula); *cf. United States v. Will*, 449 U.S. 200, 229, 101 S.Ct. 471, 66 L.Ed.2d 392 (1980) (cost of living adjust-

perceive no meaningful distinction between the escalation provision at issue in *McPhail* and *Bills* and a COLA provision: both increase plan members' pension benefits after they have retired, pursuant to a specified formula. *See Hayden v. Hayden*, 284 N.J.Super. 418, 665 A.2d 772, 774–75 (N.J.Super.Ct.App.Div.1995) ("post-retirement [COLA] increases are as much a part of the pension as the amounts initially established by the pension system on retirement"; a COLA is bargained for and granted based on an employer's assessment of the employees' worth); *Arena*, 919 A.2d at 395 (concluding that the COLA was a vested pension benefit though the ordinance at issue did not specify whether the COLA was a mere gratuity or a vital part of the pension).[16] Therefore, we conclude that, contrary to the district court's ruling, plaintiffs have a contractual right to the COLA in effect when their rights vested.

¶ 36 To the extent plaintiffs suggest that they have a contractual right in any increase in the COLA that went into effect after they became eligible to retire or retired, we reject that suggestion. Any such increase would be a mere gratuity on top of the COLA right that they earned during their employment. *See Pasadena Police Officers Ass'n v. City of Pasadena*, 147 Cal. App.3d 695, 195 Cal.Rptr. 339, 346 (1983) (because the plaintiffs retired before the legislature enacted the COLA benefit, "they never gave services with the reasonable expectation that their pensions would be adjusted for changes in the cost of living ... [and] had no vested contractual right" to the COLA); *Gulbrandson v. Carey*, 272 Mont. 494, 901 P.2d 573, 578 (1995) (because the plaintiff's retirement terms were determined according to the statutes in effect when he retired, he did not have a contractual right to an increased retirement benefit that became effective after he retired); *cf. McPhail*, 139 Colo. at 338–39, 344, 338 P.2d at 698–99, 701 (the pension benefit was not a gift or gratuity because it was funded by the pension members' contributions). We are not persuaded to the contrary by plaintiffs' reliance on language in PERA booklets and other extrinsic evidence suggesting that all PERA members would receive a COLA of three and one-half percent, compounded annually. *See Strunk v. Pub. Employees Ret. Bd.*, 338 Or. 145, 108 P.3d 1058, 1078 (2005) (pension plan handbooks, communications, and policies were irrelevant to the issue of whether the legislature had created a statutory contract).

### iii. Defendants' Arguments

¶ 37 Defendants maintain that the holdings in *McPhail* and *Bills* are no longer good law in light of more recent developments in Contract Clause jurisprudence, including the test articulated in *DeWitt*. They contend that the language of the prior versions of the COLA statutes and the circumstances surrounding the amendments are determinative of whether a contractual right exists. On this particular issue, however, *McPhail* and *Bills* remain good law.

¶ 38 We are, of course, bound to apply the *DeWitt* test. But neither *DeWitt* nor any other supreme court decision casts doubt on the continued viability of the principles the court applied in both *McPhail* and *Bills* to determine whether, in this context, a contract right exists. Indeed, Colorado appellate decisions analyzing whether a statute's language and the circumstances surrounding its enactment manifest an intent to create an enforceable contractual right have continued to regard the holdings of *McPhail* and *Bills* as authoritative (even with respect to the "limited" vested rights of those who are ineligible to retire before an adverse change in a pension benefit). *E.g., Colorado Springs Fire Fighters Ass'n*, 784 P.2d at 770 ("Rights which accrue under a pension plan are contractual obligations which are protected under article II, section 11, of the Colorado Constitution and article I, section 10 of the United States Constitution."); *Peterson v. Fire & Police Pension Ass'n*, 759 P.2d 720,

---

ment to judicial salaries vested when it took effect; applying U.S. Const. art. III, § 1).

**16.** We express no opinion on whether a statute that indicates expressly that it does not create a contractual right could nonetheless do so: none of the COLA statutes at issue in this case includes such language.

723–25 (Colo.1988) (applying the principles of *McPhail* and *Bills* to conclude that a surviving spouse had only a limited vested right to survivor benefits for a member who was not eligible for retirement before he died); *Alderton v. State*, 17 P.3d 817, 819 (Colo.App. 2000) ("The appellate courts of this state have consistently held that [rights accruing under a pension plan] constitute contractual obligations."); *McInerney v. Public Employees' Retirement Ass'n*, 976 P.2d 348, 352 (Colo.App.1998) ("In Colorado, rights that accrue under a pension plan are contractual obligations protected under [the Contract Clauses]. Retirement pay becomes a vested right when an employee has complied with the conditions imposed entitling the employee to the receipt of retirement benefits. Nevertheless, in Colorado there can be a 'limited' vesting of pension rights before actual retirement or even eligibility to retire.") (citing Bills); *Spradling v. Colo. Dep't of Revenue*, 870 P.2d 521, 523 (Colo.App.1993) (quoting and applying *McPhail*); *Knuckey v. Public Employees' Retirement Ass'n*, 851 P.2d 178, 180 (Colo.App.1992); *City of Aurora v. Ackman*, 738 P.2d 796, 800 (Colo.App. 1987) (citing *McPhail* for the proposition that the legislature cannot make a substantial adverse change to the vested pension rights of an employee who has satisfied the eligibility requirements); *see also Walker v. Bd. of Trustees*, 69 Fed.Appx. 953, 959 (10th Cir. 2003) (unpublished order and judgment) ("Once an employee retires, a trustee may not adopt an amendment that impairs an employee's vested rights under the plan . . . .") (citing *McPhail* and *Bills*).

¶ 39 Nonetheless, defendants attempt to distinguish *McPhail* and *Bills* by pointing out that the city charter provision at issue in those cases said that retirees "shall be entitled to an increase in the amount of their pension" of a particular amount. *McPhail*, 139 Colo. at 335, 338 P.2d at 696. True, the statutes at issue here do not use the word "entitled." But that makes no difference, for two reasons. First, the court in *McPhail*

and *Bills* did not mention the charter language in its analysis. Instead, the court found a contractual right based on members' provision of services and contributions to the retirement fund. *Id.* at 336–44, 338 P.2d at 697–701; *Bills*, 148 Colo. at 389–90, 366 P.2d at 584. Second, the language in the statutes here is similar to that at issue in *McPhail* and *Bills*. For many years, the relevant statutes have said that the COLA "shall be recalculated" and "shall be" a specified amount. *See* Ch. 186, sec. 7, § 24–51–1002(1), 2000 Colo. Sess. Laws 782; Ch. 138, sec. 6, § 24–51–1002(1), 1993 Colo. Sess. Laws 478; Ch. 194, sec. 8, § 24–51–1002(1), 1987 Colo. Sess. Laws 1071.[17]

¶ 40 Defendants' reliance on *Colorado Springs Fire Fighters Ass'n*, 784 P.2d 766, and *Spradling*, 870 P.2d 521, in this regard is unavailing. In the former case, the court held expressly that the benefits at issue (health plan benefits) were *not* pension benefits, and then proceeded to look to the words of the relevant statute and other circumstances. *Colorado Springs Fire Fighters Ass'n*, 784 P.2d at 772–73. In the latter case, the division considered an alleged contractual right to a tax exemption, not a pension benefit. *Spradling*, 870 P.2d at 523–24. Thus, those cases are inapposite.

¶ 41 Lastly, defendants point to two decisions by trial courts in other jurisdictions that have rejected contentions that the legislature's modification of public employee retirees' COLA violates the Contract Clause. *See Swanson v. State*, No. 62–CV–10–05285 (Minn. Dist. Ct., June 29, 2011); *Tice v. State*, Civ. No. 10–225 (S.D.Cir.Ct., Apr. 11, 2012). Those cases, however, are distinguishable.

¶ 42 In *Swanson*, the court held that the plaintiffs did not have a contractual right to a specific statutory COLA formula. No. 62–CV10–05285, slip op. at 18–19. But in that case the relevant statute required only the use of certain procedures (tied to the level of the pension fund's investment returns) to

---

**17.** We also note that in 1993 the General Assembly repealed subsection (2) of section 24–51–1001, which had said that cost of living increases were subject to approval by the General Assembly. Though the presence of that language

(which existed for only six years) could have been construed as evincing an intent not to commit to providing the COLA called for by the statute, the repeal of that provision lends itself to the opposite conclusion.

calculate "whether an adjustment is payable," on an annual basis. It did not set forth a specific rate of increase. *Id.* at 7, 9, 17. Here, however, the COLA formula was never tied to the level of PERA funding until after sections 19 and 20 of Senate Bill 10–001 took effect. Rather, the formula in effect immediately before the bill's enactment provided for a specific rate: "[t]he cumulative increase applied to benefits paid ... shall be the total percent derived by multiplying three and one-half percent, compounded annually, times the number of years such benefit has been effective after March 1, 2000." Ch. 186, sec. 7, § 24–51–1002, 2000 Colo. Sess. Laws 782.

¶ 43 In *Tice,* the court considered a COLA statute providing that " '[a]ll benefits except those depending on the member's contributions shall be annually increased by the improvement factor.' " Civ. No. 10–225, at 13 (quoting S.D. Codified Laws § 3–12–88). But the statute did not establish an "improvement factor." The court concluded that the statute mandated only that a contribution must be increased by an unspecified amount, which the legislature was free to change. *Id.* Here, as noted, the prior COLA statute established not merely the payment of a COLA, but the payment of a specified percentage, Ch. 186, sec. 7, § 24–51–1002(1), 2000 Colo. Sess. Laws 782 ("The cumulative increase ... *shall* be recalculated annually ... and *shall* be ... three and one-half percent ....") (emphasis added); *see also* Ch. 138, sec. 7, § 24–51–1002(1), 1993 Colo. Sess. Laws 478 ("The cumulative increase ... *shall* be recalculated annually ... and *shall* be the lesser of ... three and one-half percent ... and [the increase in the CPI].") (emphasis added).

 ¶ 44 In any event, we are not writing on a clean slate. As an intermediate appellate court, we are required to follow *McPhail* and *Bills,* as well as *DeWitt. People v. Allen,* 111 P.3d 518, 520 (Colo.App.2004) (the Court of Appeals is bound by decisions of the Colorado Supreme Court). *McPhail* and *Bills* continue to be controlling precedent on

this specific issue, as we perceive no inherent conflict between *DeWitt* (or any other supreme court decision) and those cases. *See Bd. of County Commis. v. Vail Assocs., Inc.,* 19 P.3d 1263, 1274 (Colo.2001) ("The doctrine of stare decisis provides that a court will follow the rule of law it has established in earlier cases, unless clearly convinced that the rule was originally erroneous or is no longer sound because of changing conditions....").

#### iv. Application to Plaintiffs

¶ 45 Mr. Halaas retired in 1999. Therefore, he has a contractual right to a COLA that is the lesser of three and one-half percent times the number of years his benefit had been effective after 1993, compounded annually, or the percent CPI increase from the year before his benefit became effective. *See* Ch. 138, secs. 6–7, 13, § 24–51–1002, 1993 Colo. Sess. Laws 478–79.

¶ 46 Ms. Hopkins retired in 2001. There is no evidence in the record indicating the specific date on which she retired. Depending on that date, she has a contractual right to the COLA in effect either before or after the 2000 COLA amendment took effect. *See* Ch. 186, sec. 9, 2000 Colo. Sess. Laws 785 (the 2000 COLA amendment "shall take effect March 1, 2001").

¶ 47 Mr. Justus retired under DPSRS in 2003. He has a contractual right to a COLA of three and one-quarter percent, compounded annually.

¶ 48 Finally, according to paragraph 4 of plaintiffs' second amended complaint, Mr. Laird became eligible to retire on February 28, 2010—*after* Senate Bill 10–001 was signed into law and the amended COLA provisions became effective. See Ch. 2, sec. 35, 2010 Colo. Sess. Laws 32 (sections 19 and 20 of Senate Bill 10–001 "shall take effect upon passage"); 2010 Colo. Sess. Laws 3153 (the governor signed the bill into law on February 23, 2010).[18] But, pursuant to the holding in *Bills,* he nevertheless has a "limited" vested right to the COLA in effect before the effec-

18. Plaintiffs assert in their briefs that they were all eligible to retire before the effective date of sections 19 and 20 of Senate Bill 10–001. The

record does not bear that out with respect to Mr. Laird.

tive date of sections 19 and 20 of Senate Bill 10–001.

### b. Substantial Impairment

¶ 49 A court usually analyzes the second two factors of the Contracts Clause test—whether a change in law impairs a contractual relationship and whether the impairment is substantial—together, considering whether the change was foreseeable, or whether it defeated the affected persons' reasonable expectations or surprised persons who had long relied on the prior version of the law. *In re Estate of DeWitt*, 54 P.3d at 858; *Kuhn v. State*, 924 P.2d 1053, 1059 (Colo.1996); *Kilbourn*, 971 P.2d at 287; *see Energy Reserves Grp.*, 459 U.S. at 412, 416, 103 S.Ct. 697; *see also id.* at 411, 103 S.Ct. 697 ("In determining the extent of the impairment, we are to consider whether the industry the complaining party has entered has been regulated in the past.").

■ ¶ 50 Plaintiffs argue that any adverse change to the COLA in which they have a contractual right necessarily violates the Contract Clauses. We recognize that there is language in *McPhail, Bills,* and other pre-*DeWitt* cases that appears to support that proposition. But that proposition is inconsistent with Contract Clause jurisprudence developed after *McPhail* and *Bills.* In *DeWitt,* the supreme court articulated the modern approach to analyzing Contract Clause claims, which, as discussed, holds that a law affecting a contractual right does not run afoul of the Contract Clauses unless it constitutes a substantial impairment of the right. Under *DeWitt* (and the Supreme Court cases it followed), the determination of whether there has been a substantial impairment rests on considerations that *McPhail* and *Bills* apparently did not regard as relevant. Thus, the distinction the court in *Bills* drew between vested and "limited" vested rights is no longer viable. All vested contract rights are limited (in the sense articulated in *Bills* ), in that there is no Contract Clause violation if there is only an insubstantial impairment or any substantial impair-

ment is reasonable and necessary to serve a significant and legitimate public purpose. In this respect, therefore, *McPhail* and *Bills* no longer remain good law. *See C & S Constr. Co., Inc. v. Martin,* 420 So.2d 788, 789 (Ala. Civ.App.1982) (intermediate appellate court must follow most recent decision of state supreme court); *Kinder v. Missouri Dep't of Corr.,* 43 S.W.3d 369, 374 (Mo.Ct.App.2001) (intermediate appellate court is constitutionally bound to follow the most recent controlling decision of the state supreme court); *State v. Patterson,* 321 Wis.2d 752, 776 N.W.2d 602, 607 (App.2009) (to the extent decisions of the state's highest court are inconsistent, intermediate appellate court must follow the most recent decision), *aff'd,* 329 Wis.2d 599, 790 N.W.2d 909 (2010).

¶ 51 Defendants urge us to conclude that the change here did not substantially impair any right plaintiffs may have had. We decline to reach that issue, however, because the district court did not address it and we think this dispute would benefit from further proceedings in the district court.[19]

### 2. Whether the Change Was Reasonable and Necessary

■ ¶ 52 Plaintiffs similarly urge us to hold that any change to the COLA in which they have a contract right necessarily violates the Contract Clauses, without regard to whether any such change was reasonable and necessary to serve a significant and legitimate public purpose. *DeWitt* and United States Supreme Court precedent, however, preclude such a conclusion. To the extent *McPhail* and *Bills* (or any other decision predating *DeWitt* ) suggest otherwise, those cases no longer remain good law.

¶ 53 We decline defendants' invitation to affirm the summary judgment on the grounds that the change, even if an impairment of contractual rights, was reasonable and necessary to serve a significant and legitimate public purpose (i.e., actuarial and funding considerations). Again, the district court has not ruled on that issue, and we believe the more prudent course is to await a

---

19. We note, however, that plaintiffs contend that they have a reasonable expectation of an irreducible (not, as defendants assert, an unchangea-

ble) COLA. Therefore, we direct the district court to consider whether there has been a substantial impairment with that in mind.

decision thereon by the district court after remand.

## C. Takings Clause Claim

¶ 54 As noted, the district court granted summary judgment on the Takings Clause claim because it had concluded that plaintiffs had not established that they have a contractual right to a particular COLA. *See Lynch v. United States,* 292 U.S. 571, 579, 54 S.Ct. 840, 78 L.Ed. 1434 (1934) (contract rights can constitute property interests protected by the Takings Clause); *see also Buffalo Teachers Fed'n,* 464 F.3d at 374–75 (assuming the contract right was property for the purpose of the Takings Clause, but noting that *Lynch* does not articulate an absolute rule). In light of our conclusion that the court erred in that regard, we also reverse the summary judgment on the Takings Clause claim.

¶ 55 The judgment is reversed, and the case is remanded to the district court for further proceedings consistent with this opinion.

Judge GRAHAM and Judge TERRY concur.